# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

MILTON TAYLOR,            :
                                :

        Petitioner,       :

                                :

     v.                     :      Civil Action No. 11-1251-CFC

                                :

ROBERT MAY, Warden, et. al.,   :

                                :

        Respondents.    :

---

## <u>MEMORANDUM OPINION</u>

Tiffani D. Hurst, Esquire, Philadelphia, Pennsylvania.  Counsel for Petitioner.


Kathryn Joy Garrison, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware.  Counsel for Respondents.      .


March 31, 2022
Wilmington, Delaware

CONNOLLY, CHIEF JUDGE:

Presently pending before the Court is an Amended Petition for a Writ of Habeas

Corpus Pursuant to 28 U.S.C. § 2254 filed by Petitioner Milton Taylor.  (D.I. 67)  The

State filed an Answer in opposition, to which Petitioner filed a Reply.  (D.I. 72; D.I. 85)

As ordered by the Court, the Parties filed supplemental briefing on whether the post-

2014 versions of Delaware Superior Court Criminal Rule 61(d)(2) and (i)(2) constitute

independent and adequate state procedural rules for procedural default purposes.  (D.I.

86; D.I. 89; D.I. 90)  For the reasons discussed, the Court will deny the Petition.

## BACKGROUND

On the morning of March 23, 2000, Steven Butler ("Butler"), a maintenance worker at the Compton Townhouse complex in Wilmington, was awaiting the arrival of some contractors when he discovered two unattended children playing in the courtyard. He recognized the children, ages two and four, as those belonging to [Theresa] Williams. Before he left to supervise the contractors, Butler instructed the children to stay away from the street until their mother came outside to join them.

Williams and her sister, Tawana Ricks ("Ricks"), previously planned to do some shopping together that morning, but Williams never arrived at the predetermined location. When Ricks could not reach her sister by telephone she decided to visit Williams' home. Ricks arrived at the Compton Townhouse complex and discovered her sister's two youngest children, unsupervised and playing in the vicinity of her sister's home. As Ricks was knocking on the locked door to Williams' home, Nathaniel Henry ("Henry"), Williams' uncle, arrived to deliver some furniture. Ricks and Henry grew increasingly concerned as their attempts to locate Williams failed.

Butler then joined Ricks and Henry. Upon Ricks' urging, Butler agreed to open Williams' door.  Once inside, Butler and Henry discovered Williams' badly beaten and bloody body concealed beneath a blanket with a bicycle on top. Williams was bleeding from her nose and had a cord wrapped around her neck. Williams was not breathing and Butler called 911. Williams

was pronounced dead at the scene. An autopsy later revealed that Williams was strangled, beaten and cut. The autopsy also revealed that Williams was pregnant, and that the baby died as a result of Williams' death.

[Petitioner] was identified as a suspect in the murder when police learned that he had a relationship with Williams and that he had been seen in the vicinity of her home on the morning of March 23, 2000. On March 25, 2000 the police received a tip that [Petitioner] was standing at a pay phone on the corner of 9th and Madison Streets. The police responded to the tip and placed [Petitioner] under arrest. Although the arresting officers were aware that [Petitioner] was wanted for questioning in regard to Williams' murder, the purpose for the arrest was an outstanding bench warrant.

At the police station, [Petitioner] was taken to an interview room where Officer Ronald Muniz ("Muniz") began routine inventory procedures. Muniz removed a folded piece of paper from the front pocket of [Petitioner's] hooded sweatshirt and placed it on the table. Shortly thereafter, Detective James Diana ("Diana") entered the room, picked up the piece of paper, opened it and began to read it. He quickly realized that the paper contained a handwritten confession (the "Confession Letter") and therefore removed the letter from the other inventoried items so that it could be included as evidence.

* * *

The confession read in pertinent part: My name is [Petitioner], I was born on 11–15–68, my Social Security number is XXX-XX-XXXX. I am wanted by the Wilmington police for the murder of Theresa Irene Williams a.k.a. Treety. I confess that I did kill Treety and left Terrel and her daughter outside because I couldn't hurt either one of them. After I strangled her I stuck a long kitchen knife in her mouth and cut something in her throat.

* * *

[The parties stipulated that [Petitioner] wrote the Confession Letter.] The Confession Letter provided the basis for a search warrant for the Victim's car which was found parked on a street in New Castle. Inside the car the police found a

> thirteen-inch knife wrapped in a bloodstained tee shirt. The blood on the shirt matched the Victim's blood type. During the investigation it became clear that the apparent motive for the murder was that [Petitioner's] current girlfriend had given him an ultimatum: end all contact with Williams or lose the current girlfriend. Taylor had apparently gone to see Williams to end contact with her and killed her in the process.

*Taylor v. State*, 822 A.2d 1052, 1054–55 (Del. 2003).

On April 24, 2000, a New Castle County grand jury indicted Petitioner for first degree murder. (D.I. 72 at 1) Petitioner filed a motion to suppress Petitioner's statement that he made in the "turnkey" area of the police department prior to his videotaped police statement and his handwritten confession letter that the police discovered during an inventory search of his belongings once in custody at the department. (D.I. 41-46 at 1-2) The Superior Court denied the suppression motion after a conducting an evidentiary hearing and reviewing briefing submitted by both parties. (D.I. 41-4) Following a three-day trial, a Superior Court jury found Petitioner guilty of first degree murder. The Superior Court held a two-day penalty hearing and sentenced him to death. (*Id.* at 1-2) Petitioner appealed, and the Delaware Supreme Court affirmed his conviction and sentence. *See Taylor*, 822 A.2d at 1058.

In December 2003, the Superior Court appointed two conflict counsel ("first Rule 61 counsel") to represent Petitioner during his post-conviction proceedings. (D.I. 72 at 2) In March 2006, Petitioner filed an motion for postconviction relief pursuant to Delaware Superior Court Criminal Rule 61. (D.I. 73-1 at 22, Entry No. 144) The State answered the amended Rule 61 motion in June 2005. (D.I. 73-1 at 23, Entry No. 161) In December 2006 and January 2007, the Superior Court held 11 days of evidentiary hearings, and then held an additional 2 days of evidentiary hearings in March 2007.

3

(D.I. 73-1 at 25-26, Entry Nos. 181 and 187)  Petitioner filed a Memorandum in Support of his Rule 61 motion ("first Rule 61 motion") in September 2009.  (D.I. 73-3)  The State filed an answer to the first Rule 61 motion in January 2010 (D.I. 73-5), and Petitioner filed a reply in March 2010 (D.I. 73-6).  The Superior Court denied Petitioner's first Rule 61 motion on August 6, 2010.  *See State v. Taylor*, 2010 WL 3511272 (Del. Super. Ct. Aug. 6, 2010).  The Delaware Supreme Court affirmed that decision on October 25, 2011.  *See Taylor v. State*, 32 A.3d 374, 391 (Del. 2011).

In 2012, now represented by the federal public defender's office, Petitioner filed in this Court a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (D.I. 11) He filed an amended petition in June 2013, to which the State filed an answer in August 2013.  (D.I. 34; D.I. 39)  In April 2014, the case was stayed pending Petitioner's exhaustion of claims to be presented to the Delaware state courts in a second Rule 61 proceeding.  (D.I. 46)

On September 9, 2016, the Delaware Superior Court stayed Petitioner's second Rule 61 proceeding pending the Delaware Supreme Court's decision in *Powell v. State*, 153 A.3d 69 (Del. 2016) regarding the retroactivity of its ruling in *Rauf v. State*, 145 A.3d 430 (Del. 2016) that Delaware's capital sentencing procedure was unconstitutional. (D.I. 73-1 at 41-42, Entry No. 271)  On April 28, 2017, following the rulings in *Powell* and *Rauf*, the Superior Court vacated Petitioner's death sentence and resentenced him to life imprisonment without the benefit of parole.  (D.I. 73-1 at 44, Entry No. 282) Petitioner did not appeal his resentencing.

In July 2017, Petitioner filed in the Superior Court a motion to reduce his sentence pursuant to Delaware Superior Court Criminal Rule 35, arguing that he should

4

have been resentenced pursuant to the class A felony statute, 11 Del. Code § 4205 (2003). (D.I. 73-1 at 45, Entry No. 288)  The Superior Court denied the Rule 35 motion in August 2017 (D.I. 73-1 at 46, Entry No. 293), and the Delaware Supreme Court affirmed that decision. *See Taylor v. State*, 2018 WL 121021 (Del. Mar. 7, 2018).

On August 25, 2017, Petitioner filed an amended second Rule 61 motion ("second Rule 61 motion"). (D.I. 73-1 at 46, Entry No. 294)  The Superior Court denied the second Rule 61 motion as procedurally barred, and the Delaware Supreme Court affirmed that decision on February 27, 2019. *See State v. Taylor*, 2018 WL 3199537 (Del. Super. Ct. June 28, 2018); *Taylor v. State*, 206 A.3d 825 (Table), 2019 WL 990718 (Del. Feb. 27, 2019).

In March 2019, Petitioner filed a motion to lift the stay on the instant proceedings, along with a proposed stipulated briefing schedule. (D.I. 56; D.I. 57)  In June 2019, Petitioner filed a second amended habeas petition, to which the State filed an objection. (D.I. 62; D.I. 63)  The Court lifted the stay, accepted the State's objections, and ordered Petitioner to file an amended petition that included caselaw to support the arguments asserted therein. (D.I. 66)  In December 2019, Petitioner filed a second amended petition ("Petition"). (D.I. 67)  The State filed an Answer, to which Petitioner filed a Reply. (D.I. 72; D.I. 85)  In September 2021, the Court ordered the Parties to file supplemental briefing concerning the effect, if any, the Delaware Supreme Court's recent decision in *Purnell v. State*, 254 A.3d 1053 (Del. 2012) has on the determination as to whether the post-2014 version of Delaware Superior Court Criminal Rules 61(d) and 61(i)(2) constituted independent and adequate state procedural rules under the federal habeas procedural default doctrine. (D.I. 86)  The State filed its Supplemental

5

Answer on December 22, 2021 (D.I. 89) and Petitioner field his Supplemental Reply on December 27, 2021 (D.I. 90).

**GOVERNING LEGAL PRINCIPLES**

**I.      The Antiterrorism and Effective Death Penalty Act of 1996**

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003). Pursuant to AEDPA, a federal court may consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Additionally, AEDPA imposes procedural requirements and standards for analyzing the merits of a habeas petition in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

**II.     Exhaustion and Procedural Default**

Absent exceptional circumstances, a federal court cannot grant habeas relief unless the petitioner has exhausted all means of available relief under state law. *See* 28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-44 (1999); *Picard v. Connor*, 404 U.S. 270, 275 (1971). AEDPA states in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that –
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or

6

> (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).  This exhaustion requirement, based on principles of comity, gives "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan*, 526 U.S. at 844-45; *see Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000).

A petitioner satisfies the exhaustion requirement by demonstrating that the habeas claims were "fairly presented" to the state's highest court, either on direct appeal or in a post-conviction proceeding, in a procedural manner permitting the court to consider the claims on their merits.  *See Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005); *Castille v. Peoples,* 489 U.S. 346, 351 (1989).  If the petitioner raised the issue on direct appeal in the correct procedural manner, the claim is exhausted and the petitioner does not need to raise the same issue again in a state post-conviction proceeding.  *See Lambert v. Blackwell,* 134 F.3d 506, 513 (3d Cir. 1997).

If a petitioner presents unexhausted habeas claims to a federal court, and further state court review of those claims is barred due to state procedural rules, the federal court will excuse the failure to exhaust and treat the claims as exhausted.  *See Coleman v. Thompson*, 501 U.S. 722, 732, 750-51 (1991) (such claims "meet[] the technical requirements for exhaustion" because state remedies are no longer available); *see also Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006).  Such claims, however, are procedurally defaulted.  *See Coleman*, 501 U.S. at 749; *Lines v. Larkins*, 208 F.3d 153, 160 (3d Cir. 2000).  Similarly, if a petitioner presents a habeas claim to the state's

7

highest court, but that court "clearly and expressly" refuses to review the merits of the claim due to an independent and adequate state procedural rule, the claim is exhausted but procedurally defaulted. *See Coleman*, 501 U.S. at 750*; Harris v. Reed*, 489 U.S. 255, 260-64 (1989).

Federal courts may not consider the merits of procedurally defaulted claims unless the petitioner demonstrates either cause for the procedural default and actual prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claims. *See McCandless v. Vaughn,* 172 F.3d 255, 260 (3d Cir. 1999); *Coleman,* 501 U.S. at 750-51. To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate actual prejudice, a petitioner must show that the errors during his trial created more than a possibility of prejudice; he must show that the errors worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494.

Alternatively, if a petitioner demonstrates that a "constitutional violation has probably resulted in the conviction of one who is actually innocent,"[1] then a federal court can excuse the procedural default and review the claim in order to prevent a fundamental miscarriage of justice. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Wenger v. Frank*, 266 F.3d 218, 224 (3d Cir. 2001). The miscarriage of justice exception applies only in extraordinary cases, and actual innocence means factual innocence, not legal insufficiency. *See Bousley v. United States*, 523 U.S. 614, 623

---

[1]*Murray*, 477 U.S. at 496.

8

(1998); *Murray*, 477 U.S. at 496. A petitioner establishes actual innocence by asserting "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial," showing that no reasonable juror would have voted to find the petitioner guilty beyond a reasonable doubt. *See Hubbard v. Pinchak*, 378 F.3d 333, 339-40 (3d Cir. 2004).

## III.    Standard of Review

If a state's highest court adjudicated a federal habeas claim on the merits, the federal court must review the claim under the deferential standard contained in 28 U.S.C. § 2254(d). Pursuant to § 2254(d), federal habeas relief may only be granted if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or the state court's decision was an unreasonable determination of the facts based on the evidence adduced in the trial. 28 U.S.C. § 2254(d)(1) & (2); *see Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). A claim has been "adjudicated on the merits" for the purposes of § 2254(d) if the state court decision finally resolved the claim on the basis of its substance, rather than on a procedural or some other ground. *See Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009). The deferential standard of § 2254(d) applies even "when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). As explained by the Supreme Court, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99.

Finally, when reviewing a habeas claim, a federal court must presume that the

9

state court's determinations of factual issues are correct.  *See* § 2254(e)(1).  This

presumption of correctness applies to both explicit and implicit findings of fact, and is

only rebutted by clear and convincing evidence to the contrary.  *See* § 2254(e)(1);

*Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000); *Miller-El v. Cockrell*, 537 U.S.

322, 341 (2003) (stating that the clear and convincing standard in § 2254(e)(1) applies

to factual issues, whereas the unreasonable application standard of § 2254(d)(2)

applies to factual decisions).

## DISCUSSION

Petitioner asserts four Claims[2] in his timely-filed Petition:  (1) trial counsel

provided ineffective assistance by failing to (a) present a defense of extreme emotional

distress ("EED"); (b) retain a forensic pathologist; (c) object to evidence of the victim's

pregnancy; (d) adequately litigate the motion to suppress Petitioner's confession note;

(e) object that the death qualification process utilized in his case created a jury that was

biased and violated his right to a fair and impartial jury, along with an independent claim

that the jury was biased; and (f) object when the State engaged in prosecutorial

misconduct, along with an independent claim that the State engaged in prosecutorial

misconduct; (2) appellate and post-conviction counsel provided ineffective assistance;

(3) the cumulative effect of each alleged error deprived Petitioner of a fair trial; and (4)

the Delaware Supreme Court violated several constitutional rights of Petitioner by failing

to resentence him pursuant to 11 Del. Code § 4205 instead of § 4209, and his sentence

---

[2]Petitioner actually presented his biased jury and prosecutorial misconduct claims as
independent claims and as part of his overall ineffective assistance of counsel claim.
For ease of  analysis, the Court has included its discussion of the substantive
independent claims in its discussion of the related ineffective assistance of counsel
argument.

to life without parole under § 4209 violates the Eighth and Fourteenth Amendments.

I.      **Claims Adjudicated on the Merits by Delaware State Courts**

Petitioner presented Claim One (A) (ineffective assistance of trial counsel with respect to EED defense) to the Delaware Supreme Court on appeal of the Superior Court's denial of his first Rule 61 motion.  Petitioner presented Claim Four (challenging his resentencing under § 4209) to the Delaware Supreme Court on appeal of the denial of his Rule 35 motion for reduction of sentence.  The Delaware Supreme Court denied both arguments as meritless. Therefore, these two Claims will warrant relief only if the Delaware Supreme Court's decisions were either contrary to, or an unreasonable application of, clearly established federal law.

### A. Claim One (A): Ineffective Assistance of Counsel for Not Presenting EED Defense

The clearly established Supreme Court precedent governing ineffective assistance of counsel claims is the two-pronged standard enunciated by *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny.  *See Wiggins v. Smith*, 539 U.S. 510 (2003).  Under the first *Strickland* prong, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance.  *Strickland*, 466 U.S. at 688.  Under the second *Strickland* prong, a petitioner must demonstrate that "there is a reasonable probability that, but for counsel's error the result would have been different."  *Id.* at 687-96.  A reasonable probability is a "probability sufficient to undermine confidence in the outcome."  *Id.* at 688.  A court many deny an ineffective assistance of counsel claim by only deciding one

11

of the *Strickland* prongs.  *See Strickland*, 466 U.S. at 697.

In order to sustain an ineffective assistance of counsel claim, a petitioner must make concrete allegations of actual prejudice and substantiate them or risk summary dismissal.  *See Wells v. Petsock*, 941 F.2d 253, 259-60 (3d Cir. 1991); *Dooley v. Petsock*, 816 F.2d 885, 891-92 (3d Cir. 1987).  Although not insurmountable, the *Strickland* standard is highly demanding and leads to a "strong presumption that the representation was professionally reasonable."  *Strickland*, 466 U.S. at 689.

In Claim One (A), Petitioner asserts that trial counsel provided ineffective assistance by failing to investigate and present the defense of extreme emotional distress at trial.  (D.I. 67 at 28-44)  According to Petitioner, trial counsel failed to "consult with an expert regarding the possibility of an extreme emotional distress defense," and "reasonably competent counsel would have made this determination and retained an expert to explore the viability of an EED defense months before trial."  (D.I. 67 at 28-29)  More specifically, he asserts:

> Had counsel conducted an adequate investigation, they would have learned of evidence supporting an EED defense which could have been presented to the jury.  Dr. Jonathan H. Mack, a neuropsychologist, and Dr. Edward J. Dougherty, a forensic psychologist, both evaluated [Petitioner] during his initial Rule 61 proceedings and concluded that [Petitioner] was acting under extreme emotional distress at the time of Ms. Williams's death. [Petitioner's] jury, however, never heard this evidence. Nor did it hear the roots of that distress – that at the time of her death, [Petitioner] believed that Ms. Williams had been with another man and that she was leaving him.  In fact, Joseph (Jay) Williams, Jr., the father of one of Ms. Williams's children, stated that Ms. Williams had told him she planned to end her relationship with [Petitioner] on the morning of March 23, 2000, and instead planned to be with him.  This outright rejection and abandonment triggered overwhelming feelings of fear and controllable anger in [Petitioner] that were

connected to the physical and psychological abuse he
endured as a child, and that [Petitioner's] compromised brain
was powerless to control.

(D.I. 67 at 29-30)

To support his contention that trial counsel would have discovered information

supporting an EED defense if they had conducted a more thorough investigation,

Petitioner has provided declarations from several individuals in his life describing the

physical and emotional abuse and parental abandonment they believe he suffered.[3]

(D.I. 67 at 31-53)  He asserts that, given his lack of proper treatment,

the chronic, severe, psychological and physical abuse [he]
endured as a child and adolescent created an adult
hypersensitive and hyperreactive to any perceived threat of
abandonment or rejection.  Those "explosive" feelings of
abandonment and rejection erupted in [Petitioner] the morning
of Ms. Williams's death, when [Petitioner] believed that Ms.
Williams had been with another man and was about to end

_____

[3]The Court notes that the information gleaned from the numerous declarations which
Petitioner presents in this proceeding was not presented to the Delaware state courts in
Petitioner's first Rule 61 proceeding in 2006-2011, but was presented to the Delaware
state courts in his second Rule 61 proceeding in 2017.  One of the Claims discussed
later in this Opinion alleges that first post-conviction counsel was ineffective for not
investigating further and obtaining this additional background information to be
presented in the first Rule 61 proceeding.  Other evidence presented in Petitioner's
second Rule 61 proceeding but not in his first Rule 61 proceeding also includes a report
by Dr. Victoria Reynolds, a forensic psychologist, that describes the effects of
Petitioner's traumatic childhood on his ability to "self-modulate" his behavior, and an
affidavit by Dr. Charles Welti, a medical examiner and forensic pathologist, that was
presented in order to rebut the trial testimony of the State's medical examiner.  *See
Taylor*, 2018 WL 3199537, at *7.  While Petitioner does not explicitly mention Dr.
Victoria Reynold's report in this proceeding, he cites to her report (D.I. 59-5) when
summarizing the information provided in the numerous affidavits to present Petitioner's
history.  (D.I. 67 at 32, 36, 51,53)  The Superior Court summarily dismissed Petitioner's
second Rule 61 motion as second or subsequent under Rule 61(d)(2) after concluding
that Petitioner's new evidence did not satisfy the "actual innocence" exception to Rule
61(d)(2)'s bar because "actual innocence" means factual innocence, not legal
innocence.  *Id.* at *7-8.

their relationship.    As both Dr. Dougherty and Dr. Mack concluded, [Petitioner] was acting under extreme emotional distress at the time of Ms. Williams's death.

Had trial counsel presented the above evidence [*i.e.*, the information provided in the numerous declarations] through the testimony of qualified experts, the jury would have learned that [Petitioner] was acting under extreme emotional distress at the time of Ms. Williams's death and that the distress was reasonably explained by [Petitioner's] belief that Ms. Williams was abandoning him as well as by his history of neglect and abuse and resulting psychiatric difficulties.    There was no reasonable strategic reason for trial counsel's failure to investigate and present such evidence at trial when trial counsel admittedly knew that pursuing an EED defense was in Petitioner's best interest.    Trial counsel's failure to do so was prejudicial, and there was a reasonable probability that, had counsel done so, the jury would have rejected the charge of first degree murder.

(D.I. 67 at 53-54)

In Petitioner's first Rule 61 proceeding, the Superior Court denied Claim One (A) after finding that "no reasonable juror would have accepted the extreme emotional distress claim presented at the postconviction hearing."  *Taylor*, 2010 WL 3511272, at *24-25.  More specifically, and after noting that Petitioner's original defense team retained "two doctors, a pastoral counselor, and two psycho-forensic investigators"[4] to assist in Petitioner's defense, the Superior Court opined:

Essentially, this argument again boils down to trial counsel's alleged failure to investigate. As presented in detail above, however, most of [Petitioner's] allegations are flatly untrue. Again, trial counsel immediately employed an experienced, masters-level, licensed, social worker to coordinate [Petitioner's] psycho-forensic evaluation. They retained three mental health experts in different disciplines. An experienced psychologist did an initial evaluation shortly after [Petitioner's] arrest. A less-experienced, but qualified, psychological

---

[4]*Taylor*, 2010 WL 3511272, at *24.

14

assessor performed formal testing not long after the initial evaluation. Finally, close to trial, a psychiatrist reviewed the test results and further examined [Petitioner]. All the experts spoke with [Petitioner] about the murder and they all had extreme emotional distress, as well as other defenses and mitigators, in mind.

Trial counsel examined [Petitioner's] Ferris School and Division of Family Services records. Based on the information they gathered, after serious consideration and repeated attempts to establish it, trial counsel made the reasonable decision not to pursue an extreme emotional distress defense that was unsupported by their client and the hard evidence.

Furthermore, the extreme emotional distress defense now envisioned by [Petitioner's] new counsel and his new experts is another argument that sits on the defense's fault line. The hypothetical extreme emotional distress defense turns on [Petitioner's] personal background, including its family dynamics. [Petitioner] still appears to be opposed to that evidence's use. So, while it is true that counsel could, technically, attempt to present that defense over [Petitioner's] objection, the idea is impractical, at best. In any event, as explained above, the whole theory is far-fetched.

Having presided over the trial and postconviction relief hearing, the court rejects the argument that competent counsel should have raised extreme emotional distress on behalf of a client who told them what [Petitioner] said about the murder, including his spotty memory of it, not being jealous and his being highly intoxicated by his voluntary use of drugs and alcohol. That is so, even if counsel found experts like Drs. Dougherty and Mack to make the claim.

As presented above, [Petitioner] repeatedly told trial counsel that before he went to Williams's home, he had been drinking and using drugs, and he knew Williams was pregnant by another man, but he was not jealous about that. Moreover, there was no claim of a jealous flare-up during the final meeting. [Petitioner] barely remembered the actual murder. By the same token, there is no evidence, whatsoever, that Williams said or did anything that provoked [Petitioner], much less was there evidence of a causal relationship between any provocation and the murder.

15

> The fanciful nature of [Petitioner's] extreme emotional distress argument is, perhaps, best reflected by the fact that [Petitioner], himself, still does not claim extreme emotional distress. No one, including the postconviction relief experts, has explained how counsel could make a convincing extreme emotional distress case without [Petitioner's] cooperation. In reaching that conclusion, the court is aware that [Petitioner's] new experts see [Petitioner's] inability to recall and testify about how he murdered Williams as proof that he was provoked and under extreme emotional distress. But, again, even if there were an explanation, trial counsel cannot be faulted now for not raising the defense, and there was no prejudice to [Petitioner] because trial counsel considered but did not try that tack. No reasonable juror would have accepted the extreme emotional distress claim presented at the postconviction relief hearing.

*Taylor*, 2010 WL 3511272, at *25.  Additionally, the Superior Court stated that,

> while it may be argued that Drs. Turner, Walsh, and Tavani could possibly have performed more or different tests, or that trial counsel could have retained different doctors, the mere fact that [Petitioner's] counsel did not shop around for a psychiatrist willing to testify to the presence of more elaborate or grave psychological disorders simply does not constitute ineffective assistance. Trial counsel's hires were objectively reasonable, and trial counsel were not required to find "the best" psychologists and psychiatrists available. Even if counsel had retained "the best" experts, there is no guarantee that the experts would have developed favorable opinions of [Petitioner].

*Taylor*, 2010 WL 3511272, at *20.

The Delaware Supreme Court affirmed the Superior Court's decision, explaining:

> [Petitioner] insists that his trial counsel should have, but did not, consider other avenues of inquiry. The postconviction hearing testimony of his trial defense counsel sharply controverts that claim. Although [Petitioner] instructed his trial counsel to pursue an "all or nothing actual innocence" defense and present no mitigating evidence, counsel nonetheless retained two experts who questioned [Petitioner's]

16

truthfulness about possible mitigating factors. Trial counsel also strived to "tease" out an EED defense for [Petitioner], and explored potential defenses based on mental illness and drug addiction. But, the original defense experts did not detect any brain damage to which [Petitioner] now points as "missed" evidence in mitigation. The trial court also found that the head trauma claims on which [Petitioner's] new experts based their diagnosis were "largely uncorroborated."

[Petitioner's] new postconviction defense experts, Drs. Dougherty and Mack, based their opinions on uncorroborated statements [Petitioner] made to them. Expert opinions based on uncorroborated statements do not automatically render trial counsel's performance deficient. As the Superior Court properly held, trial counsel's mental health investigation and their mitigation investigation are not rendered inadequate merely because the defendant has now secured the testimony of a more favorable mental health expert.

*Taylor*, 32 A.3d at 384 (cleaned up).

With respect to the first prong of this Court's inquiry under § 2254(d)(1), a "state court decision is contrary to clearly established federal law if it applies a rule that contradicts the governing law set forth in Supreme Court precedent, or if it confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from that reached by the Supreme Court." *Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013). Here, the Delaware courts correctly identified the *Strickland* standard applicable to the ineffective assistance of counsel claims in this case, and their decisions were not contrary to *Strickland*. *See Williams*, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause.").

The Court must also determine if the Delaware state courts reasonably applied

17

the *Strickland* standard to the facts of Petitioner's case. *See Harrington*, 562 U.S. at 105-06. When performing the "reasonable application" inquiry, the Court must review the Delaware state court's denial of Petitioner's ineffective assistance of counsel allegations through a "doubly deferential" lens. *Id.* "[T]he question is not whether counsel's actions were reasonable, [but rather], whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* When assessing prejudice under *Strickland*, the question is "whether it is reasonably likely the result would have been different" but for counsel's performance, and the "likelihood of a different result must be substantial, not just conceivable." *Id.* And finally, when viewing a state court's determination that a *Strickland* claim lacks merit through the lens of § 2254(d), federal habeas relief is precluded "so long as fairminded jurists could disagree on the correctness of the state court's decision." *Id.* at 101.

It is well-settled that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. However, defense counsel's strategic choices may still amount to deficient performance where there has been a failure to conduct a reasonable investigation before deciding on a particular strategy. *See id.* at 690-91. The Third Circuit has elaborated on counsel's duty to make investigations, explaining that "[c]ounsel can make a strategic decision to halt an avenue of investigation to reach that decision, but decisions not to investigate certain types of evidence cannot be called 'strategic' when counsel fails to seek rudimentary background information." *Salaam v. Sec'y of Pennsylvania Dep't Corrs.*, 895 F.3d 254, 268 (3d Cir. 2018). The Court's "principal concern in deciding whether [counsel] exercised reasonable professional judgment is ...

18

whether the investigation supporting counsel's decision not to introduce mitigating evidence [here, of Petitioner's EED] was itself reasonable." *Wiggins*, 539 U.S. at 522-23.

In this case, the Superior Court denied Claim One (A) after concluding that Petitioner failed to satisfy both prongs of *Strickland*: deficient performance and prejudice. The Delaware Supreme Court affirmed the Superior Court's decision after determining that Petitioner failed to satisfy *Strickland*'s performance prong and, therefore, stated that it "need not reach or address the prejudice prong issue under *Strickland*." *Taylor*, 32 A.3d at 385.

The Delaware Supreme Court did not unreasonably apply clearly established federal law by only addressing the performance prong of *Strickland* without considering the issue of prejudice. *See Strickland*, 466 U.S. at 697. The Court must also determine if the Delaware Supreme Court's affirmance of the Superior Court's denial of Claim One (A) involved an unreasonable application of *Strickland*.

The record considered by the Delaware state courts in Petitioner's first Rule 61 proceeding reveals the following relevant information. Trial counsel retained three experts when formulating a defense theory: Dr. Alvin Turner, Ph.D., an experienced psychologist; Dr. James Walsh, Ph.D., a qualified psychological assessor; and Dr. Carole Tavani, M.D., a psychiatrist. *See Taylor*, 2010 WL 3511272, at *25. All three of these experts agreed that Petitioner's behavior was consistent with a diagnosis of antisocial personality disorder. *See Taylor*, 2010 WL 3511272, at *3-9. In addition, Dr. Tavani stated that Petitioner had a bad temper when he drank, a history of abusing and killing animals, setting a girl's hair on fire, and committing burglaries. *Id.* at *7-8.

19

Petitioner told Dr. Tavani that he had "coke, weed, beer, and alcohol" the night before killed Williams, and that he had "six or seven" girlfriends at the time of the murder. *Id.* at *8. Dr. Tavani advised trial counsel that, as a result of her evaluation, she could not offer a psychiatric defense or anything helpful to mitigation. *Id.* at *9.

Dr. Turner testified that Petitioner had described his family, running away from home, alleged physical abuse by his step-father, education, placement at the Ferris school, and subsequent imprisonment as an adult. *Id.* at *4. After meeting with Petitioner on four different occasions, Dr. Turner completed a written evaluation (which he provided to trial counsel) stating that he did not see basis for a mental illness defense, "including extreme emotional distress." *Id.* After noting that Petitioner denied the use of alcohol before the murder, Dr. Turner could only opine that Petitioner had an antisocial personality disorder. *Id.*

Dr. Walsh diagnosed Petitioner with antisocial personality disorder, cannabis dependence, cocaine abuse, and parent-child relational problems. *Id.* Although Petitioner informed Dr. Walsh that he had stopped drinking, he still regularly used marijuana, occasionally used cocaine, and used heroin and PCP once or twice. *Id.* at *5. Dr. Walsh provided details about Petitioner's background since birth, including how he started selling drugs when he was ten years old because his mother would not buy him expensive sneakers and his stepfather beat him with "belts, electrical wire, drumsticks, and shoes." *Id.* at *4. Dr. Walsh testified that he believed Petitioner's juvenile delinquent behavior came first, followed by school problems, then followed by his parent's discipline. *Id.* Dr. Walsh also stated that Petitioner was often vague and suspicious making it difficult to determine if he was reliably reporting information. *Id.* at

20

*6.

The Superior Court also heard the testimony of two new mitigation experts during Petitioner's first Rule 61 evidentiary hearings – Dr. Edward Dougherty, a psychologist and Dr. Johnathan Mack, a neuropsychologist. *Id.* at *12-14. Dr. Dougherty testified that Petitioner suffers from the antisocial personality disorder, attention deficit/hyperactivity disorder, and borderline personality disorder, and concluded that Petitioner was under extreme emotional distress at the time in question. *Id.* at *12. Dr. Mack opined that his testing of Petitioner supported Dr. Dougherty's diagnosis of attention deficit hyperactivity disorder, and also explained that he found evidence of mild brain damage. *Id.* at *14. Dr. Mack also concluded that Petitioner was under extreme emotional distress at the time of the murder due to his belief that Williams was cheating on him. *Id.* at *15.

The record also reveals that trial counsel "examined school and Division of Family Services records, and met with [Petitioner[, his mother, his stepfather, and others." *Taylor*, 2010 WL 3511272, at *17. During Petitioner's first Rule 61 proceeding, trial counsel testified that, although they seriously considered pursuing an EED defense, they could not "tease" one out of Petitioner. *Id.* at *19.

It is well-settled that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Nevertheless, defense counsel's strategic choices may still amount to deficient performance where there has been a failure to conduct a reasonable investigation before deciding on a particular strategy. *See id.* at 690-91. The Third Circuit has elaborated on counsel's duty to make investigations, explaining that

"[c]ounsel can make a strategic decision to halt an avenue of investigation to reach that decision, but decisions not to investigate certain types of evidence cannot be called 'strategic' when counsel fails to seek rudimentary background information." *Salaam.*, 895 F.3d at 268.  A reviewing court's "principal concern in deciding whether [counsel] exercised reasonable professional judgment is ... whether the investigation supporting counsel's decision not to introduce mitigating evidence [here, of Petitioner's EED] was itself reasonable." *Wiggins*, 539 U.S. at 522-23.

As an initial matter, the aforementioned record demonstrates that trial counsel diligently investigated potential mitigating factors and considered potential defenses based on mental illness and drug addiction.  Trial counsel's decision not to investigate further was reasonable when viewed in context with the opinions provided by the retained mental health experts, and the information gleaned from records, Petitioner's friends, his family, and Petitioner himself.

In turn, given the results of trial counsel's more than adequate investigation, trial counsel's strategic decision not to pursue an EED defense did not fall below objective standards of reasonableness.  Pursuant to 11 Delaware Code § 641,

> [t]he fact that the accused intentionally caused the death of another person under the influence of extreme emotional distress is a mitigating circumstance, reducing the crime of murder in the first degree as defined by § 636 of this title to the crime of manslaughter as defined by § 632 of this title. The fact that the accused acted under the influence of extreme emotional distress must be proved by a preponderance of the evidence. The accused must further prove by a preponderance of the evidence that there is a reasonable explanation or excuse for the existence of the extreme emotional distress. The reasonableness of the explanation or excuse shall be determined from the viewpoint of a reasonable person in the accused's situation under the

22

circumstances as the accused believed them to be. Extreme emotional distress is not reasonably explained or excused when it is caused or occasioned by the accused's own mental disturbance for which the accused was culpably responsible, or by any provocation, event or situation for which the accused was culpably responsible, or when there is no causal relationship between the provocation, event or situation which caused the extreme emotional distress and the victim of the murder. Evidence of voluntary intoxication shall not be admissible for the purpose of showing that the accused was acting under the influence of extreme emotional distress.

11 Del. Code § 641. Section 641 places the burden on the defendant to prove that he acted "under the influence of extreme emotional distress" and "that there is a reasonable excuse or explanation for the existence of the extreme emotional distress." *Capano v. State*, 781 A.2d 556, 631 (Del. 2001). As the Superior Court found in denying Claim One (A),

> [Petitioner] repeatedly told trial counsel that before he went to Williams's home, he had been drinking and using drugs, and he knew Williams was pregnant by another man, but he was not jealous about that. Moreover, there was no claim of a jealous flare-up during the final meeting. [Petitioner] barely remembered the actual murder. By the same token, there is no evidence, whatsoever, that Williams said or did anything that provoked [Petitioner], much less was there evidence of a causal relationship between any provocation and the murder.

*Taylor*, 2010 WL 3511272, at *25. When considered in conjunction with the various diagnoses from the mental health experts trial counsel did retain, Petitioner's criminal history, and his confession, having Petitioner testify "would have been disastrous," because the "State could have easily challenged [Petitioner's] credibility and, in the process, further emphasized [Petitioner's] felonious background and lack of contrition." *Taylor*, 2010 WL 3511272, at *7. Thus, the Court concludes that trial counsel's

23

investigation into Petitioner's life history and their decision not to pursue an EED defense did not constitute deficient performance under the first prong of the *Strickland* standard.

Having determined that trial counsel did not perform deficiently, the Court does not need to address the issue of prejudice. Nevertheless, the Court concludes that Petitioner cannot demonstrate *Strickland* prejudice. In its 2011 decision on post-conviction appeal, the Delaware Supreme Court stated that "Drs. Dougherty and Mack [] based their opinions on uncorroborated statements [Petitioner] made to them." *Taylor*, 32 A.3d at 384. Here, Petitioner contends that "the factual premise upon which the Delaware Supreme Court relied in denying [Claim One (A)] was incorrect," because the "numerous declarations present counsel obtained" after his first Rule 61 appeal provides corroboration for those expert opinions. (D.I. 67 at 54) The Court construes this argument as Petitioner's attempt to demonstrate that trial counsel's failure to adequately investigate and discover the information contained in the numerous declarations presented by current counsel prejudiced him, presumably because the Delaware Supreme Court would not have discounted the expert opinions as being uncorroborated but for trial counsel's deficient performance.[5] The Court is not

---

[5]To the extent the Court should view Petitioner's argument regarding the Delaware Supreme Court's "uncorroborated statements" statement as an allegation that the Delaware Supreme Court made an unreasonable determination of fact under § 2254(d)(2), the argument is summarily rejected. Pursuant to § 2254(d)(2), the Court must measure the reasonableness of the state court's factual findings against the record evidence at the time of the state court's adjudication. *See Rountree v. Balicki*, 640 F.3d 530, 538 (3d Cir. 2011). Here, the Delaware Supreme Court rendered its "factual determination" that the expert opinions issued by Drs. Mack and Dougherty were uncorroborated in 2011. Present counsel, however, did not obtain the instant declarations until 2013. In short, the Court cannot consider the declarations in

persuaded.  Petitioner's detailed summary of his life history as presented in the numerous declarations  – including physical and emotional abuse and parental abandonment – does not demonstrate a reasonable probability that he would have been able to establish a viable EED defense under Delaware law, or that he would have found an expert willing to put forth an EED defense based on that information.  In other words, even if trial counsel had broadened their investigation, discovered the additional detailed background information provided in the declarations, and found an expert to opine that Petitioner suffered from EED at the time he murdered Williams, Petitioner has failed to demonstrate a "substantial likelihood of a different result."  *Strickland*, 466 U.S. at 693.

Accordingly, the Court will deny Claim One (A) for failing to satisfy § 2254(d).

### B.  Claim Four:  Petitioner's Sentence to Life Without Parole

In its 2016 decision *Rauf v. State*, 145 A.3d 430 (Del. 2016), the Delaware Supreme Court held that "Delaware's current death penalty statute violates the Sixth Amendment role of the jury" in light of the United States Supreme Court's decision in *Hurst v. Florida*, 136 S.Ct. 616 (2016).  The *Rauf* court also addressed the following question:

> If any procedure in 11 Del. C. § 4209's capital sentencing scheme does not comport with federal constitutional standards, can the provision for such be severed from the remainder of 11 Del. C. § 4209, and the Court proceed with instructions to the jury that comport with federal constitutional standards?

*Id.* at 434.  The *Rauf* court answered the question:

---

assessing the reasonableness of the Delaware Supreme Court's 2011 factual finding because the declarations were not part of the record at that point in time.

25

> No. Because the respective roles of the judge and jury are so complicated under § 4209, we are unable to discern a method by which to parse the statute so as to preserve it. Because we see no way to sever § 4209, the decision whether to reinstate the death penalty—if our ruling ultimately becomes final—and under what procedures, should be left to the General Assembly.

*Id.*

In the years following its decision in *Rauf*, the Delaware Supreme Court clarified that: (1) *Rauf* applies retroactively to a death sentence that was already final when *Rauf* was decided. *See Powell v. State*, 153 A.3d 69, 71 (Del. 2016); and (2) *Rauf*'s severability question was ""only ... whether it was possible to sever the constitutionally-infirm parts of the capital punishment scheme from the constitutionally-sound ones in a way that would preserve the death penalty." *Zebroski v. State*, 179 A.3d 855, 861 (Del. 2018). In *Zebroski*, the Delaware Supreme Court explicitly held that "*Rauf* did not [] invalidate the entirety of section 4209, and, as we said in *Powell*, the statute's life-without-parole alternative is the correct sentence to impose on a defendant whose death sentence is vacated. And we find no constitutional fault in imposing that sentence on him." *Id.* at 857.

In 2017, pursuant to *Rauf*, the Superior Court vacated Petitioner's death sentence and resentenced him under § 4209(a) to life imprisonment without the benefit of probation or parole. Petitioner filed a motion to correct or reduce that sentence on three grounds: (1) he should have been resentenced under § 4205 to an indeterminate life sentence with a mandatory minimum of fifteen years because the plain language in *Rauf* rendered § 4209 void and unenforceable; (2) a mandatory life sentence without

26

parole constitutes cruel and unusual punishment under the Eight Amendment; and (3) a mandatory life sentence without parole violates his Fourteenth Amended due process rights.  (D.I. 73-9 at 14-22)  The Superior Court denied the motion to correct sentence, and the Delaware Supreme Court affirmed that decision.

Now, in Claim Four, Petitioner contends that: (1) given the absence of clear legislative intent in the wake of *Rauf* finding § 4209 unconstitutional in its entirety, the Superior Court lacked authority to presume that the Delaware legislature would have enacted a mandatory sentence of life without parole and therefore erred by resentencing him under 11 Del. Code § 4209 instead of § 4205 (D.I. 67 at 89, 91); (2) his mandatory sentence of life without parole constitutes cruel and unusual punishment under the Eighth Amendment (D.I. 67 at 95); and (3) the Superior Court violated his right to due process under the Fourteenth Amendment by imposing a mandatory sentence of life without parole (D.I. 67 at 89, 95).  Generally, a state court's sentencing decision and claims arising out of that decision are not cognizable in a federal habeas proceeding, unless the sentencing constitutes cruel and unusual punishment under the Eighth Amendment, exceeds the statutory limits, or is arbitrary or otherwise in violation of due process.  *See Chapman v. United States,* 500 U.S. 453, 465 (1991); *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991); *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) ("State courts are the ultimate expositors of state law.").

### 1.  Absence of clear legislative intent

Petitioner contends that, given the absence of clear legislative intent, the Superior Court erred by resentencing him under § 4205 because *Rauf* declared § 4209 unconstitutional in its entirety.  Whether viewed as an argument that the Delaware state

27

courts misinterpreted and misapplied a Delaware sentencing statute, or an argument that the Delaware Supreme Court violated the separation of powers between a state court and a state legislature by resentencing him under § 4209, Petitioner has asserted a state law claim that is not cognizable on federal habeas review.  *See Lewis v. Jeffers,* 497 U.S. 764, 780 (1990) (holding that, "Federal habeas corpus relief does not lie for errors of state law."); *Whalen v. United States,* 445 U.S. 684, 689 n. 4 (1980) ("the doctrine of separation of powers embodied in the Federal Constitution is not mandatory on the States"); *Mullaney,* 421 U.S. at 691 ("Federal courts entertaining petitions for writs of habeas corpus are bound by the construction placed on a State's criminal statutes by the courts of that State"); *Austin v. Jackson*, 213 F.3d 298, 302 (6th Cir. 2000) (finding that petitioner's claim asserting his state sentence violated the "separation of powers between the judicial branch and the executive branch in the state of Michigan" was not cognizable on federal habeas review); *Johnson v. Rosemeyer,* 117 F. 3d 104, 109 (3d Cir. 1997) ("[A] state court's misapplication of its own law does not [ ] raise a constitutional claim").  Therefore, the Court will deny the instant sub-argument of Claim Four for failing to assert a proper basis for federal habeas relief.

## 2.  Eighth Amendment

Next, Petitioner contends that his mandatory life sentence without parole violates the Eighth Amendment because Delaware is the only non-death penalty state to punish an act defined as broadly as "intentional killing" with such a sentence.  (D.I. 67 at 94-95)  He asserts, "[r]are usage indicates societal rejection of mandatorily imposing this extreme penalty, rendering it cruel and unusual under the Eighth Amendment."  (D.I. 67

at 95)

Petitioner presented a substantially similar claim to the Delaware Supreme Court on appeal of the Superior Court's denial of his Rule 35 motion. Citing United States Supreme Court and its own precedent, the Delaware Supreme Court rejected the argument, stating that "[t]he Eighth Amendment is not violated every time a State reaches a conclusion different from a majority of its sisters over how to best administer its criminal laws. Instead, we defer to the General Assembly's determination." *Taylor*, 2018 WL 121201, at *1 (*citing Rummel v. Estelle*, 445 U.S. 263, 274 (1980)). Given these circumstances, Petitioner's Eighth Amendment argument will only warrant habeas relief if the Delaware Supreme Court's decision was either contrary to, or an unreasonable application of, clearly established federal law.

"[T]he Eighth Amendment contains a narrow proportionality principle that does not require strict proportionality between crime and sentence, but rather forbids only extreme sentences that are grossly disproportionate to the crime." *Graham v. Florida,* 560 U.S. 48, 59-60 (2010); *see also Ewing v. California*, 538 U.S.11, 30 (2003); *Lockyer v. Andrade,* 538 U.S. 63, 72 (2003). Although the Supreme Court has not identified clear factors for determining "gross disproportionality,"[6] it has identified four principles to be considered when conducting a proportionality review: "the primacy of the legislature, the variety of legitimate penalogical schemes, the nature of our federal system, and the requirement that proportionality review be guided by objective factors." *Ewing v. California,* 538 U.S. at 23. "In conducting this analysis, a court grants

---

[6]*Lockyer*, 538 U.S. at 72 (noting that "[o]ur cases exhibit a lack of clarity regarding what factors may indicate gross proportionality").

substantial deference to legislative decisions regarding punishments for crimes." *United States v. Burnett*, 773 F.3d 122, 136 (3d Cir. 2014).  As noted by the Supreme Court, ""one could argue without fear of contradiction by any decision of this Court that for crimes concededly classified and classifiable as felonies, that is, as punishable by significant terms of imprisonment in a state penitentiary, the length of the sentence actual imposed is purely a matter of legislative prerogative." *Rummel*, 465 U.S. at  274. Notably, "[o]utside the context of capital punishment, *successful* challenges to the proportionality of particular sentences [will be] exceedingly rare." *Solem v. Helm*, 463 U.S. 277, 289-90 (1983) (emphasis in original)*; see also Lockyer*, 538 U.S. at 77 ("The gross disproportionality principle reserves a constitutional violation for only the extraordinary case.").

Reviewing the decision of the Delaware Supreme Court in light of the applicable legal principles, the Court concludes that the Delaware Supreme Court's rejection of Petitioner's instant Eighth Amendment argument was not contrary to or an unreasonable application of clearly established federal law.  The Supreme Court has held that a life sentence, even for a non-violent property crime, is constitutional.  *See Harmelin v. Michigan*, 501 U.S. 957, 961, 994-96 (1995) (upholding a sentence of life without parole for a defendant convicted of possession more than 650 grams of cocaine, even though it was the defendant's first offense); *Rummel*, 445 U.S. at, 265-66 (1980).  Moreover, the Delaware Supreme Court's reliance on *Rummel* was consistent with the Supreme Court's pronouncements in both *Lockyer* and *Ewing*.  *See Lockyer*, 538 U.S. at 74 (stating that "*Harmelin* allows a state court to reasonably rely on *Rummel* in determining whether a sentence is grossly disproportionate."); *see Ewing*, 538 U.S. at

22, (reiterating that *"Rummel* stands for the proposition that federal courts should be reluctant to review legislatively mandated terms of imprisonment, and that successful challenges to the proportionality of particular sentences should be exceedingly rare.").

### 3. Due Process

Finally, Petitioner argues that imposition of a life sentence without the possibility of parole violates the Fourteenth Amendment Due Process Clause because, at the time of trial, he was not on "notice that a sentence of life without parole would be the only – indeed, the mandatory – sentence upon conviction of first degree murder." (D.I. 67 at 95) He asserts his "trial strategy sure would have been different" if he had been on notice, because there "would have been no penalty phase proceeding at which to present evidence to mitigate the crime." (*Id.*) Notably, Petitioner does not provide any details about his original strategy and how he would have altered that strategy.

Petitioner presented this same argument to the Delaware Supreme Court upon appeal of the denial of his motion to correct sentence. The Delaware Supreme Court denied the argument because Petitioner "did not state how the strategy or advice would have differed, nor how it would have affected the outcome of the case." *Taylor*, 2018 WL 1212021, at *2. Petitioner's argument in this proceeding suffers from the same deficiency, and speculation as to how trial counsel might have altered their advice or trial strategy is insufficient to establish a due process violation. Given these circumstances, the Court concludes that the Delaware Supreme Court's denial of Petitioner's due process argument was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.

Accordingly, the Court will deny Claim Four in its entirety.

31

## II.   Claims Dismissed By Delaware State Courts as Procedurally Barred

The remaining Claims in the instant Petition – Claims One (B)-(F), Two and

Three – were presented to the Delaware state courts in Petitioner's second amended

Rule 61 motion in 2017 ("second Rule 61 motion").[7]   The Superior Court reviewed

Petitioner's second Rule 61 motion under the version of Rule 61 that was amended in

2014.   After determining that Petitioner did not satisfy the actual innocence exception to

the procedural bars in the 2014 version of Rule 61, the Superior Court dismissed the

motion as second or subsequent under Rule 61(d)(2).   *See Taylor*, 2018 WL 3199537,

at *8.   The Delaware Supreme Court affirmed that decision.[8]   *Taylor*, 2019 WL 990718,

at *1.

Pursuant to the procedural default doctrine, a federal habeas court cannot review

a claim dismissed by a state court "if the decision of [the state] court rests on a state law

ground that is independent of the federal question and adequate to support the

judgment." *Coleman v. Thompson*, 501 U.S. 722 , 729 (1991).   The State contends that

the post-2014 version of Rule 61(d)(2) is an independent and adequate state procedural

---

[7]The Court recognizes that Petitioner actually filed his original second Rule 61 motion in
November 2014, and then filed his amended second Rule 61 motion in August 2017.
*See Taylor*, 2018 WL 3199537, at *1-2.   Since both second Rule 61 motions were filed
after the June 4, 2014 amendments to Rule 61, and since the Superior Court only
considered the claims presented in the second amended Rule 61 motion that was filed
in 2017, the Court's reference to the August 2017 Rule 61 motion does not affect its
analysis of the procedural issues in this case.

[8]Because the Delaware Supreme Court affirmed the Superior Court's judgment "on the
basis of and for the reasons stated in its June 2, 2018 opinion, the Court will "look
through" that decision to the Superior Court's opinion denying Petitioner's second Rule
61 motion as procedurally barred under Rule 61(d)(2).   *See Wilson v. Sellers*, 138 S.Ct.
1188, 1192 (2018).

ground and, therefore, Claims One (B)-(F), Two, and Three are barred from habeas review.  Petitioner argues that his Claims are not barred because the post-2014 version of Rule 61 that was applied to his case does not constitute an "adequate" state procedural rule under the procedural default doctrine.  Petitioner, however, does not contest the independence of the post-2014 version of Rule 6 (d)(2).  Therefore, the Court will address only the "adequacy" of the 2014 version of Rule 61 for purposes of the procedural default doctrine.[9]

### A. Relevant Sections of Rule 61

Delaware Superior Court Criminal Rule 61 has been amended at various times, but the inquiry here focuses on the 2006 and 2014 versions of the rule's bar against successive motions.  In 2006, Rule 61(i)(2) and (5) provided:

> (2) Repetitive motion – Any ground for relief that was not asserted in a prior-post conviction proceeding, as required by subdivision (b)(2) of this rule, is thereafter barred, unless consideration of the claim is warranted in the interest of justice.
>
> \*      \*      \*
>
> (5) Bars inapplicable – The bars to relief in paragraphs (1), (2), and (3) of this subdivision shall not apply to a claim that the court lacked jurisdiction or to a colorable claim that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity, or fairness of the proceedings leading to the judgment of conviction.

Del. Super. Crim. R. 61(i)(2), (i)(5) (2005).

Rule 61 was amended in June 2014.  The 2014 version of Rule 61(i)(2) provides:

---

[9]The requirements of independence and adequacy are distinct. *Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007).  A state procedural rule is "independent" when resolution of the state law question does not depend on a federal constitutional ruling. *See Ake v. Oklahoma*, 470 U.S. 68, 75 (1985).

(i) Bars to Relief.

    (2) Successive motions.

        (i)  No second or subsequent motion is permitted under this Rule unless that second or subsequent motion satisfies the pleading requirements of subparagraphs (2)(i) or (2)(ii) of subdivision (d) of this rule.

        (ii) Under paragraph (2) of subdivision (b) of this Rule, any first motion for relief under this rule and that first motion's amendments shall be deemed to have set forth all grounds for relief available to the movant. That a court of any other sovereign has stayed proceedings in that court for purpose of allowing a movant the opportunity to file a second or subsequent motion under this rule shall not provide a basis to avoid summary dismissal under this rule unless that second or subsequent motion satisfies the pleading requirements of subparagraphs (2)(i) or (2)(ii) of subdivision (d) of this rule.

Del. Super. Crim. R. 61(d)(2), (i)(2) (2014).  The 2014 version of Rule 61(d)(2) provides:

    (d) Preliminary Consideration.

        (2) Second or subsequent postconviction motions. A second or subsequent motion under this rule shall be summarily dismissed, unless the movant was convicted after a trial and the motion either:

            (i) pleads with particularity that new evidence exists that creates a strong inference that the movant is actually innocent in fact of the acts underlying the charges of which he was convicted; or

            (ii) pleads with particularity a claim that a new rule of constitutional law, made retroactive to cases on collateral review by the United States Supreme Court or the Delaware Supreme Court, applies to the movant's case and renders the conviction or death sentence invalid.

34

Del. Super. Crim. R. 61(d)(2), (i)(2) (2014).

### B. Adequacy of the 2014 Version of Rule 61

A state procedural rule is "adequate" to bar federal habeas review if "it was 'firmly

established and regularly followed'" at the time of the alleged default. *Ford v. Georgia*,

498 U.S. 423-24 (1991); *Williams v. Beard*, 637 F.3d 195, 221 (3d Cir. 2011). The

adequacy requirement "is intended both to ensure that state courts do not insulate

disfavored claims from federal review, and to ensure that federal habeas review is not

barred unless petitioners have fair notice of the steps they must take to avoid default."

*Campbell v. Burris*, 515 F.3d 172, 179 (3d Cir. 2008). "[A] state procedural bar may

count as an adequate and independent ground for denying a federal habeas petition

even if the state court had discretion to reach the merits despite the default." *Walker v.*

*Martin*, 562 U.S. 307, 311 (2011). Additionally, "[a] discretionary rule ought not be

disregarded automatically upon a showing of seeming inconsistencies" in its

application. *Id.* at 320. In *Johnson v. Lee*, the Supreme Court held that California's

*Dixon* bar[10] was both firmly established and regularly followed, explaining that the *Dixon*

bar is "firmly established" because the California Supreme Court warned defendants for

decades that, "absent 'special circumstances,' habeas 'will not lie where the claimed

errors could have been, but were not, raised upon a timely appeal from a judgment of

conviction.'" *Johnson v. Lee,* 578 U.S. 605, 608 (2016). The Supreme Court also

explained that "there is little difference between discretion exercised through an

otherwise adequate procedural bar's exceptions and discretion that is a part of the bar

---

[10]"Under the so-called '*Dixon* bar,' a defendant procedurally defaults a claim raised for
the first time on state collateral review if he could have raised it earlier on direct appeal."
*Johnson* , 578 U.S. at 606.

itself." *Id.* at 610–11.

As summarized by the Third Circuit:

> [i]n applying these principles, this Court seeks to determine whether the state rule itself provides guidance regarding how the rule should be applied or whether such standards have developed in practice. However, neither an occasional act of grace by a state court ... nor a willingness in a few cases to overlook the rule and address the claim on the merits renders a rule inadequate. A rule can be adequate if the state supreme court faithfully applies it in "the vast majority" of cases.

*Campbell v. Burris*, 515 F.3d 172, 179 (3d Cir. 2008). The adequacy of a state procedural bar is a question of federal law. *See Lee v. Kemna*, 534 U.S. 362, 375 (2002).

Petitioner contends that the prohibition against second or subsequent Rule 61 motions contained in the 2014 version of Rule 61 – as applied to his case – does not constitute an "adequate state procedural bar" for procedural default purposes, because he did not have "fair notice" of the summary dismissal provisions added to the 2014 version of the rule when he filed his first Rule 61 motion in 2006. The State contends that the prohibition against second or subsequent Rule 61 motions contained in the 2014 version of Rule 61 constitutes an adequate procedural for two reasons. First, when Petitioner filed both his first and second motions for postconviction relief, Rule 61(i)(2) prohibited defendants from filing claims that were not raised in a prior motion for postconviction relief. As a result, in 2006, Petitioner had notice that claims presented in a successive Rule 61 motion would be procedurally barred. In other words, the bar against successive motions contained in the 2014 version of Rule 61 was not novel.

36

Second, the 2014 version of Rule 61 was firmly established and regularly followed when Petitioner filed his second amended Rule 61 motion in August 2017 (the date the State contends is the relevant date for default purposes). (D.I. 89 at 10-15)

The Third Circuit has articulated a three-step test for determining the adequacy of a state procedural rule. *See Bronshtein v. Horn*, 404 F.3d 700, 708 (2005). First, the Court must identify the relevant rule upon the which the Superior Court based its decision. Here, the relevant rule is the 2014 version of Rule 61.

Second, the Court must identify the relevant point in time that Petitioner violated the rule, *i.e.*, committed the default. *See Fahy v. Horn*, 516 F.3d 169, 188 (3d Cir. 2008) (explaining that determining whether a procedural rule was "firmly established and regularly followed is determined as of the date the default occurred, not the date the state court relied on it, because a petitioner is entitled to notice of how to present a claim in state court."). Petitioner contends that his default of the rule against successive Rule 61 motions occurred in 2006 when he filed his first Rule 61 motion without including all of his claims. The State contends that Petitioner's default occurred in 2017, when he filed his second Rule 61 motion containing new claims. In *Bronshtein*, the procedural rule at issue was the one-year statute of limitations applied to Pennsylvania post-conviction motions. The Third Circuit found that Bronshtein's default occurred when he had failed to file a post-conviction motion by the end of the one-year period, not when he filed the motion that was later determined to be time-barred. *Id.* at 708. This reasoning would indicate that the relevant time period in this case is 2006, when Petitioner failed to include all of his claims in his first Rule 61 motion. The Court has found very limited caselaw directly addressing this issue, but that caselaw provides

37

support for Petitioner's contention that his default occurred in 2006. *See, e.g.,*
*Petrocellli v. Angelone,* 248 F.3d 877, 886 (9th Cir. 2001) (finding that the time of default
of bar on successive state post-conviction petitions occurred when Petrocelli filed his
first state post-conviction petition.); *Anderson v. Carlin*, 2014 WL 1317610, *8 (D. Idaho
Mar. 31, 2014) ("'Adequacy' for federal habeas corpus procedural bar purposes is
measured at the time of the purported default – here, the date the successive petition
was filed, not the date the court considered it."); *Blake v. Baker*, 2016 WL 5508822, at
*4 (D. Nev. Sept. 28, 2016) ("Because the analysis focuses on the time the purported
default occurred and not when a state court actually applies the bar, respondents must
show that Nev. Rev .Stat. § 34.810 had become clear, consistently applied, and well-
established by the time Blake filed his counseled supplemental petition in his first state
post-conviction proceeding (May 2007)."). Therefore, the Court will use 2006 as the
relevant date in step three.

In the third step of the adequacy inquiry, the Court must determine if the 2014
version of Rule 61 was "firmly established and regularly followed" on the date of its
application – June 28, 2018.

Although the 2014 version of Rule 61 is fairly recent, Delaware courts have
consistently applied the rule to bar successive motions since its enactment. Indeed,
since the actual "bar" on successive motions has not changed, Delaware courts have
consistently applied the rule to bar successive motions for decades.

Petitioner's challenge to the adequacy of the 2014 version of Rule 61's bar on
successive motions does not focus on what the two different versions of Rule 61
actually "bar" but, rather, on the difference in the exceptions to the successive bar

contained in the 2006 and 2014 versions.  Specifically, he frames the question in terms of whether he had notice in 2006 of the available exceptions to the bar that would apply to any future attempt to avoid the procedural bar for successive motions:

> At the time of [Petitioner's] default [in 2006], he had no notice that, in 2014, the interest of justice and miscarriage of justice exceptions would be abolished, and that he would be subjected to a new rule whereby any new and formerly adjudicated claims would be summarily dismissed unless he was actually innocent, or plead with particularity that a new rule of constitutional law applies to his case rendering  his conviction or sentence invalid.  Therefore, the 2014 default bars applied to [Petitioner] in 2018 were inadequate to satisfy the fair notice requirement.

(D.I. 67 at 19)  Elaborating on the difference between the exceptions to the bars in the 2006 and 2014 versions of Rule 61, he asserts:

> At the time of [Petitioner's] 2006 default (where he failed to add the majority of the claims before the court), [Petitioner] was on notice that should his counsel fail to file a colorable claim that he was deprived of a substantial constitutional right, this claim would still be considered by the Delaware state courts as long as the evidence supported that his claim was more than mere speculation but less than a colorable showing.  He was also on notice that the law of the case and former adjudication doctrines would not be enforced if it was in the interest of justice not to do so.  If a claim had not been raised in a prior post-conviction proceeding, Rule 61 explicitly allowed the court to consider the claim "in the interest of justice." Rule 61(i)(2) (2005).  Similarly, if a defendant raised "a colorable claim that there was a miscarriage of justice," Rule 61 again explicitly allowed the court to consider the claim, even if it was untimely or had not been raised in a prior proceeding. *Id.* In 2006, the Delaware courts recognized that the principles of equity mandated a fail-safe.

(D.I. 67 at 17)

In practice, however, both the Rule 61(i)(2) and (5) exceptions in the 2006 version of Rule 61 were rarely applied. As explained by the Delaware Supreme Court in 1990, "[t]he fundamental fairness exception . . . is a narrow one and has been applied only in limited circumstances, such as when the right relied upon has been recognized for the first time after the direct appeal." *Younger v. State*, 580 A.2d 552, 555 (Del. 1990). Notably, "[c]ases in which [the Delaware Supreme Court] has previously found that the interests of justice require an exception to the procedural bars of Rule 61(i)(2) or (i)(4) have involved specific allegations compelling subsequent factual or legal developments that suggest, for example, that a conviction was procured by false testimony or that the court lacked the authority to punish the defendant." *Deputy v. State*, 2014 WL 3511720, at *2 n.10 (Del. 2014). Petitioner's claims in his second Rule 61 motion meets none of these standards and, contrary to his assertion, the exceptions in the 2006 version of Rule 61 motion were not a "fail safe."

There is no question that the exception to the successive bar in the 2014 version of Rule 61 is more restrictive than the 2006 version. Under the 2014 version, "findings of actual innocence [to satisfy the exception to the bar] are reserved for the 'rare' or 'extraordinary' case." *See State v. Adkins*, 2021 WL 3783636, at *5 (Del. Super. Ct. Aug. 25, 2021). To date, the Delaware Supreme Court has only held one case to satisfy the exception in the 2014 version of Rule 61: *Purnell v. State*, 254 A.3d 1053 (Del. 2021). The *Purnell* Court explicitly addressed the difference between the exceptions in the pre-and-post 2014 versions of Rule 61:

> Prior to the 2014 amendments, Rule 61 provided an exception to the application of the procedural bars involving colorable claims of a miscarriage of justice. As we said in *Swan*, "Rule

40

> 61(i)(5) [provides] an exception to the bars of Rule 61(i)(1), (2), and (3) for a colorable claim that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity, or fairness of the proceedings that lead to the conviction." Under the old rule, we have no doubt Purnell would obtain relief on this successive motion, without the need to provide compelling new evidence of his actual innocence.

*Purnell*, 254 A.3d at 1094, n. 185 (cleaned up).

For more than two decades, this Court has consistently found the pre-2014 version of Rule 61(i)(2) to be an adequate (and independent) state procedural bar.[11]  In 2016, this Court explicitly held that the Delaware state courts have applied Rule 61 in a consistent and ascertainable manner since 1990. *See Zebroski v. Pierce*, 2016 WL 697614, at *8 (D. Del. Feb. 22, 2016).  Although this Court in *Zebroski* recognized that a

---

[11]*See Binaird v. Pierce*, 981 F. Supp. 2d 281, 288 (D. Del. 2013); *Anderson v. Phelps*, 930 F. Supp. 2d 552, 564 (D. Del. 2013); *Caldwell v. Phelps*, 945 F. Supp. 2d 520, 535 (D. Del. 2013); *Price v. Phelps*, 894 F. Supp. 2d 504, 524 (D. Del. 2012); *Garvey v. Phelps*, 840 F. Supp. 2d 782, 786-87 (D. Del. 2012); *Johnson v. Phelps*, 810 F. Supp. 2d 712,  718 (D. Del. 2011); *Johnson v. Phelps*, 723 F. Supp. 2d 735, 740 (D. Del. 2010); *Buchanan v. Johnson*, 723 F. Supp. 2d 727, 733 n.4 (D. Del. 2010); *Grosvenor v. Deloy*, 2010 WL 717550, at *4 (D. Del. Mar. 1, 2010); *Harris v. Phelps*, 662 F. Supp. 2d 364, 371-72 n.4 (D. Del. 2009); *Bodnari v. Phelps*, 2009 WL 1916920, at *5 (D. Del. July 6, 2009); *Cochran v. Phelps*, 623 F. Supp. 2d 544, 552 (D. Del. 2009); *Dixon v. Phelps*, 607 F. Supp. 2d 683, 688 (D. Del. 2009); *Fogg v. Phelps*, 579 F. Supp. 2d at 612; *Drummond v. Ryan*, 572 F. Supp. 2d 528, 534 (D. Del. 2008); *Yost v. Williams*, 572 F. Supp. 2d 491, 496 n.3 (D.Del. 2008); *VanLier v. Carroll*, 535 F. Supp. 2d 467, 474 (D. Del. 2008); *Mills v. Carroll*, 515 F. Supp. 2d 463, 468 (D.Del. 2007); *Zuppo v. Carroll*, 458 F. Supp. 2d 216, 235 (D. Del. 2006); *Hamilton v. Kearney*, 2006 WL 2130716, at *3 (D. Del. July 28, 2006); *Summers v. Carroll*, 2006 WL 1338770, at *4 (D. Del. May 16, 2006); *Elliott v. Kearney*, 2004 WL 724958, at *4 (D. Del. Mar. 31, 2004); *Webb v. Carroll*, 2003 WL 22299036, at *9 (D. Del. Oct. 6, 2003); *McLaughlin v. Carroll*, 270 F. Supp. 2d 490, 510 (D. Del. 2003); *Kirk v. Carroll*, 243 F. Supp. 2d 125, 143 (D. Del. 2003); *Vickers v. Delaware*, 2002 WL 31107362, at *8 (D. Del. Sept. 23, 2002); *Maxion v. Snyder*, 2001 WL 848601, at *10 (D. Del. July 27, 2001); *Lawrie v. Snyder*, 9 F. Supp. 2d 428, 453 (D. Del. 1998); *Carter v. Neal*, 910 F. Supp. 143, 150-51 (D. Del. 1995).

petitioner could argue that the courts applied Rule 61(i)(2) in his or her case in an inconsistent manner, that is not Petitioner's contention in this case.  Instead, Petitioner contends that the 2014 version of Rule 61 is inadequate as applied to him because he did not have notice in 2006 that a successive Rule 61 motion would be subject to summary dismissal.

While it is true that Petitioner did not have notice in 2006 that the known exceptions to Rule 61's successive bar would be amended eight years later, the Court is not persuaded that the subsequent amendment to the exceptions in a firmly established and regularly followed procedural bar on successive motions renders the 2014 version of the successive bar inadequate.  As the Third Circuit explained when considering the adequacy of Delaware Supreme Court Rule 8, the relevant legal issue is "whether, at the relevant point in time, the judicial discretion contemplated by the state rule is being exercised in a manner that lets people know when they are at risk of default and treats similarly-situated people in the same manner."  *Campbell v. Burris*, 515 F.3d 172, 181 (3d Cir. 2008).  When Petitioner filed his first Rule 61 motion in 2006, he had notice under Rule 61(i)(2) that obtaining review for successive claims not included in an initial Rule 61 motion would require the exercise of a defined amount of judicial discretion to determine if he fit within one of the statutory exceptions to the bar.  When Petitioner filed his second Rule 61 motion in 2017, he had notice under Rule 61(i)(2) that obtaining review for successive claims not included in an initial Rule 61 motion would require the exercise of a defined amount of judicial discretion to determine if he could satisfy the statutory exceptions to the bar.  Although the defined amount of judicial discretion to be exercised when determining if the exceptions are satisfied

42

changed from 2006 to 2014, at all times Petitioner knew – *i.e.*, had fair notice – that the failure to include all claims in his first Rule 61 motion would result in a default. Viewed in this manner, it is evident that Petitioner had fair notice in 2006 that he should include all claims in his first Rule 61 motion or risk having subsequent motions be barred as successive. *See Cabrero v. Barbo*, 175 F.3d 307, 313 (3d Cir. 1999) ("a petitioner should be on notice of how to present his claims in the state courts if his failure to present them is to bar him from advancing them in a federal court."). Thus, the Court concludes that the 2014 version of Rule 61, as applied to Petitioner's case, constitutes an adequate state procedural bar.

### C. Did Petitioner's Presentation of Claims in his Second Rule 61 Appeal Exhaust State Remedies

Petitioner presented the remaining Claims in the instant Petition – Claims One (B)-(F), Two and Three – to the Superior Court in his second Rule 61 motion. When Petitioner appealed the denial of the motion to the Delaware Supreme Court, he did not brief these claims. Instead, he attached a copy of his second Rule 61 motion to his appellate brief. (D.I. 73-16; D.I. 73-17) In its Rule 61 appellate reply, the State asserted in a footnote that Petitioner's "failure to brief the claims he raised below constitutes a waiver and abandonment of those claims on appeal." (D.I. 73-25 at 16 n.21) Petitioner responded that he did not waive or abandon the claims, and provided two arguments as to why the Delaware Supreme Court should reject the State's assertion. (D.I. 73-26 at 6)

The Delaware Supreme Court did not mention any waiver or abandonment of claims when it affirmed the Superior Court's judgment. Instead, it stated, "after careful

43

consideration of the parties' briefs and the record on appeal, we find it evident that the final judgment of the Superior Court should be affirmed on the basis of and for the reasons stated in its June 28, 2018 opinion." *Taylor*, 2019 WL 990718, at *1.

In this proceeding, the State argues that Petitioner did not exhaust state remedies for Claims One (B)-(F), Two and Three because he did not "fairly present" the Claims to the Delaware Supreme Court on post-conviction appeal. The Court is not persuaded. The Delaware Supreme Court did not raise the issue of waiver or abandonment in its Order. Rather, it clearly stated it was affirming the Superior Court for the same reasons provided by the Superior Court when it denied Petitioner's second Rule 61 motion. Given the Delaware Supreme Court's summary affirmance and silence on the issue of abandonment or waiver, the Court "looks through" the Delaware Supreme Court's decision to the Superior Court's decision. *See Y1st V. Nunnemaker*, 501 U.S. 797, 804 (1991). The Superior Court thoroughly analyzed the issue of Petitioner's procedural default. Therefore, the Court concludes that Petitioner exhausted state remedies for his remaining Claims, and that the Delaware Supreme denied them as procedurally barred for the same reasons set forth by the Superior Court.

### D. *Martinez* Does Not Aid Petitioner In Establishing Cause For His Default

To reiterate, the State contends that the Court cannot review the merits of Claims One (B)-(F), Two, and Three unless Petitioner demonstrates cause and prejudice, or that a miscarriage of justice will occur without a merits review. Citing *Martinez v. Ryan*, 566 U.S. 1, 9 (2012), Petitioner contends that post-conviction counsel's failure to raise the instant Claims in his first Rule 61 proceeding constitutes cause for his default.

In *Martinez,* the Supreme Court held that inadequate assistance of counsel during an initial-review state collateral proceeding may establish cause for a petitioner's procedural default of a claim of ineffective assistance of trial counsel. *Id.* at 12, 16-17. In order to obtain relief under *Martinez*, a petitioner must demonstrate that: (1) the defaulted ineffective assistance of trial counsel claim is "substantial"; (2) counsel in the initial state collateral review proceeding was ineffective or absent under the standard articulated in *Strickland*; and (3) that he was prejudiced. *Id.* at 14-17. In *Workman v. Sup't Albion SCI*, 915 F.3d 928, 938 (3d Cir. 2019), the Third Circuit recognized that, in order to show that post-conviction counsel's errors "caused prejudice under *Strickland*," a petitioner would have to essentially show that the defaulted claim is itself meritorious. *Id.* at 938-39. "In other words, *Martinez* appears to require a state prisoner to prevail on the merits of his underlying claim merely to excuse the procedural default and obtain consideration on the merits." *Owens v. Stirling*, 967 F.3d 396, 423 (4th Cir. 2020). To avoid this conundrum, the Third Circuit held that a petitioner satisfies *Martinez* by showing: (1) that initial postconviction counsel performed deficiently under *Strickland*'s first prong by not exhausting the underlying ineffective assistance of trial counsel claim (but petitioner does not have to show that post-conviction counsel's deficient performance was prejudicial under *Strickland*'s second prong); and (2) that the underlying ineffective assistance of trial counsel claim is substantial. *See Workman*, 915 F.3d at 940. A "substantial claim" is one that has "some merit", and a petitioner demonstrates "some merit" by showing that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed

45

further." *Id.* at 938.  "If [a petitioner] shows that his underlying ineffective assistance of trial counsel ('IATC') claim has some merit and that his state post-conviction counsel's performance fell below an objective standard of reasonableness, he has shown sufficient prejudice from counsel's ineffective assistance that his procedural default must be excused under *Martinez*." *Id.* at 941.

In an effort to demonstrate that first post-conviction counsel performed deficiently under *Strickland*'s first prong and avoid default under *Martinez*, Petitioner contends that first post-conviction counsel provided ineffective assistance by failing to investigate and pursue grounds for relief beyond claims of ineffective assistance of trial counsel.  (D.I. 67 at 23)  Citing the American Bar Association Guidelines for the Appointment and Performance of  Defense Counsel in Death Penalty Cases ("ABA Guidelines"),[12] Petitioner asserts that post-conviction counsel "cannot rely on the previously compiled record but must conduct a thorough, independent investigation, and should litigate *all* issues, whether or not previously presented, that are arguably meritorious under the standards applicable to high quality capital defense representation."  (D.I. 67 at 23) (emphasis in original)  In Petitioner's words:

> Initial post-conviction counsel's failure to investigate, develop and present the claims listed below [Claims One (B)-(F), Two-Three] was ineffective because it was not strategic. It is axiomatic that a reasonable investigation must take place before counsel can make a strategic choice regarding which issues to include in a  habeas petition.

---

[12]Ironically, post-conviction counsel in Petitioner's first Rule 61 proceeding also relied on the ABA Guidelines when arguing that trial counsel provided ineffective assistance by failing to conduct a thorough investigation of the defendant's history. *See Taylor*, 2010 WL 3511272, at *16.

(D.I. 67 at 24)

Petitioner's summary and conclusory assertion that post-conviction counsel erred by not presenting these allegations in his first Rule 61 proceeding does not satisfy his burden to demonstrate that post-conviction counsel's representation was objectively unreasonable.  Significantly, Petitioner completely ignores that the Superior Court appointed two attorneys to represent him in his Rule 61 proceeding and post-conviction appeal.  Instead, he focuses solely on the professional and personal struggles suffered by one of his two post-conviction attorneys ("attorney A") and describes attorney A's history of: (1) professional disciplinary issues in 1987, 1991, and 2002; (2) entry of a guilty plea in 2013 to two criminal charges of sexual harassment and soliciting sexual favors in exchange for legal services; and (3) a diagnosis of post-traumatic stress disorder ("PTSD"), and memory limitations as a result of a concussion and use of prescription drugs.  (D.I. 67 at 9)  While attorney A's troubled past is unfortunate and *may* have had an impact on his (attorney A's) performance, attorney A's personal and professional history does not necessarily support Petitioner's conclusory statement that attorney A "did not effectively present or litigate all reasonable grounds for relief" in his first Rule 61 proceeding.  (D.I. 67 at 9)  Petitioner does not identify any particular instance where attorney A's "issues" may have affected his Rule 61 proceeding or allege that any particular trial event or decision was affected.  To the extent Petitioner is suggesting that the Court should *per se* declare attorney A ineffective based on his professional and personal travails, the Court has not found any case indicating that the Supreme Court or federal circuit court has adopted a *per se* rule of ineffective

47

assistance based on an attorney's suspension from practicing law that occurred at time other than counsel's time of representation, PTSTD, or undiagnosed memory issues.

Inexplicably, Petitioner does not address the performance of the other attorney ("attorney B") who represented him during the first Rule 61 proceeding, despite the fact that she actively participated in the preparation for and litigation of his first Rule 61 proceeding.[13]  There is nothing in the record to indicate that attorneys A and B were not equally responsible for making decisions on investigation and arguments to be pursued during Petitioner's first Rule 61 proceeding.  Consequently, the Court views Petitioner's failure to even cursorily address how attorney B may have provided deficient performance as a sufficient reason to conclude that Petitioner has failed to establish that the performance of his first post-conviction counsel fell below an objective standard of reasonableness.

Moreover, the fact that Petitioner's current counsel has obtained declarations from numerous friends and family describing Petitioner's traumatic life history does not *ipso facto* demonstrate that first post-conviction counsel failed to conduct a reasonable investigation into what issues to pursue.  As articulated by the Supreme Court, "[w]hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect."

---

[13]Petitioner does not even include attorney B's name in his list of counsel who represented him during his state court proceedings.  (D.I. 67 at 26)  While no longer practicing law, attorney B (Jennifer-Kate M. Aaronson) was an experienced death penalty attorney at the time of Petitioner's Rule 61 proceeding and was subsequently appointed chief disciplinary counsel for the Delaware Office of Disciplinary Counsel. Attorney B's experience provides additional support for presuming that the failure to pursue the claims at issue was due to a strategic decision made after a reasonable investigation rather than deficient performance.

*Yarborough v. Gentry*, 540 U.S. 1, 8 (2003). "Even if some of the arguments would unquestionably have supported the defense, it does not follow that counsel was incompetent for failing to include them. Focusing on a small number of key points may be more persuasive...." *Id.* at 7. Here, Petitioner's assertions fail to overcome *Strickland*'s "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

The Court also notes that the record does not support and indeed contradicts Petitioner's unsubstantiated allegation that post-conviction counsel (either together or individually) provided ineffective assistance during his first Rule 61 proceeding. Contrary to Petitioner's assertion, this is not a case in which post-conviction counsel only raised ineffective assistance of counsel claims (IATC). Rather, counsel made nine claims, four of which were for IATC, in the first Rule 61 motion: (1) IATC for failing to investigate defenses and mitigators; (2) IATC for failing to object to non-statutory aggravators; (3) Petitioner's waiver of presenting mitigating evidence was not knowing, voluntary, and intelligent; (4) IATC for failing to prepare mental health defenses; (5) IATC for failing to object to the trial court's consideration of evidence not presented to the jury; (6) prosecutorial misconduct during closing argument; (7) IATC for failing to object to the trial court's anti-sympathy jury instruction; (8) Delaware's method of execution constitutes cruel and unusual punishment; and (9) Delaware's death penalty statute is unconstitutional. (D.I. 73-18 at 88-110) The Superior Court conducted fourteen days of evidentiary hearings, during which post-conviction counsel called the following witnesses to testify: trial counsel; Jesse Hambright, a Department of Correction guard who had regular contact with Taylor from 2000 to 2001; Judith Mellen,

49

former executive director of the ACLU, who investigated overcrowding and harsh punishments at Ferris School in 1989 (Petitioner was in Ferris until 1986); Robert Golebiewski, a presentence officer who testified at Petitioner's penalty hearing; John Scholato, Jr., Petitioner's teacher at Ferris School and Gander Hill Prison; David Ruhnke, Esquire, who had tried fourteen capital cases in Maryland and had reviewed Petitioner's file and written a report regarding his opinions; Regina Devlin, mentioned in the confession and introduced above; Brother David; and Drs. Edward Dougherty and Jonathan H. Mack, postconviction psychologists. *See Taylor*, 2010 WL 3511272, at 11. Post-conviction counsel also attempted to call Petitioner's mother as a witness. "Although [Petitioner's] mother testified at the penalty hearing, she resisted process, adamantly refusing to cooperate or testify on her son's behalf at the postconviction hearing. The court denied [Petitioner's] request for an arrest warrant." *Id*. at *12. Additional testimony was taken by deposition post-hearing. *Id*. at *11.

      In sum, after viewing Petitioner's general allegations regarding attorney A's professional and personal history, and the lack of any allegations regarding attorney B's performance, in conjunction with this brief summary of the record, the Court concludes that Petitioner has failed to plead facts sufficient to establish that post-conviction counsel's investigation and presentation of claims during his first Rule 61 proceeding and appeal fell below an objective standard of reasonableness.  Thus, Petitioner has failed to establish cause for his default of the IATC arguments in Claims One (B)-(F). Additionally, to the extent Claim One (E) asserts an independent claim that the death qualification process created a biased jury, Claim One (F) asserts an independent claim alleging prosecutorial misconduct, and Claims Two and Three assert arguments other

50

than IATC, *Martinez* does not provide an avenue to establish cause for his default of these Claims because they are not IATC claims.

### E. Petitioner Cannot Demonstrate Actual Prejudice Caused By Default Or That A Miscarriage Of Justice Will Occur Without Review

In the absence of cause, the Court does not need to address the issue of prejudice. Nevertheless, Petitioner cannot establish that he has suffered prejudice as a result of his procedural default of Claims One (B)-(F), Two, and Three. The Court will address the absence of prejudice and the unavailability of the miscarriage of justice exception with respect to Petitioner's remaining Claims *in seriatim*.

#### 1. Claim One (B): Failure to retain a forensic pathologist

In Claim One (B), Petitioner contends that trial counsel failed to consult with a forensic pathologist to prepare for trial and, therefore, was not prepared to rebut the "false and inaccurate" testimony concerning the details of Williams' death provided by the State medical examiner, Dr. Adrienne Sekula-Perlman. (D.I. 67 at 55) Petitioner asserts that that the medical examiner's testimony provided the only evidence of intent, and she inaccurately testified that: (1) it took Williams four minutes to die by strangulation; and (2) the blunt and sharp force injuries to Williams' body contributed to her death. (D.I. 67 at 55-56) According to Petitioner, "it is likely that [he] would have been convicted of a lesser offense" if trial counsel had presented a qualified expert. (D.I. 67 at 55) Petitioner is incorrect.

At trial, the medical examiner testified that a person who is strangled by ligature will first lose consciousness and then die "after approximately four minutes or so." (D.I. 41-48 at 5) Petitioner argues that the report of his postconviction expert, Dr. Charles

51

Wetli, proves that the medical examiner's statement is wrong.  In his report, Dr. Wetli asserts, "[o]ne cannot dogmatically state how long it takes to die in a homicidal strangulation [] but certainly in less than the four minutes Dr. Sekula-Perlman testified it would have taken."  (D.I. 73-24 at  63)  Dr. Wetli's report also states, "because of the deceased's morbid obesity, which led to an already compromised chest cavity and airway, loss of consciousness and death likely ensued even more rapidly," and that "neither sharp force nor blunt force injuries contributed to [] Williams' death.  (*Id.* at 61-63)

Dr. Wetli's determinations do not aid Petitioner in demonstrating ineffective assistance, because the facts of this case do not hinge on how long it took Williams to die once strangled.  In his confession note, Petitioner admitted that he strangled, beat, and "stuck a long kitchen knife down [Williams'] mouth and cut something in her throat." *Taylor*, 822 A.2d at 1054 n.5.  Even with the opinion of a different pathologist, the facts of this case prove intentional murder.  Therefore, Petitioner cannot demonstrate that trial counsel's failure to retain a forensic pathologist actually prejudiced him.

The Court also concludes that the miscarriage of justice exception does not apply to excuse Petitioner's default of the instant Claim, because he has not provided new reliable evidence of his actual innocence.  Therefore, the Court will deny Claim One (B) as procedurally barred.

### 2.  Claim One (C): Failure to object to evidence of Williams' pregnancy

Petitioner argues that trial counsel was ineffective for failing to object to the "prejudicial and irrelevant" evidence that Williams was pregnant when he murdered her.

His argument is meritless. The fact of Williams' pregnancy would have been before the jury with or without objection from trial counsel. Petitioner's handwritten confession note stated: "There should be no sympathy for me because I killed a pregnant woman who was carrying my child." (D.I. 41-47 at 126) In addition, the autopsy protocol confirmed that Petitioner was pregnant when Petitioner murdered her, and that the fetus died as a result. (D.I. 41-48 at 6) The State could properly present evidence of Williams' pregnancy to prove Petitioner's state of mind, *i.e.,* that he committed intentional murder. Petitioner has failed to demonstrate prejudice resulting from trial counsel's failure to object to evidence of Williams' pregnancy.

The Court also concludes that the miscarriage of justice exception does not apply to excuse Petitioner's default of the instant Claim, because he has not provided new reliable evidence of his actual innocence. Therefore, the Court will deny Claim One (C) as procedurally barred.

### 3. Claim One (D): Failure to adequately litigate the motion to suppress his confession note

In Claim One (D), Petitioner contends that trial and appellate counsel were ineffective for failing to succeed in suppressing his handwritten confession. Trial counsel filed a motion to suppress Petitioner's confession note on the basis that the police violated his Fourth Amendment rights by seizing and reading the note without a warrant during an inventory search of his belongings in the turnkey area of police headquarters. The Superior Court denied the motion. *See State v. Taylor*, 2001 WL 282813, at *3 (Del. Super. Ct. Mar. 20, 2001). Petitioner raised the issue on direct appeal, and the Delaware Supreme Court affirmed the Superior Court's decision. *See*

53

*Taylor*, 822 A.2d at 1055-56.  Specifically, the Delaware Supreme Court held that this type of routine inventory search was a well-defined exception to the warrant requirement and, therefore, did not violate the United States Constitution.  *See id.* at 1055.

In this proceeding, Petitioner contends that trial and appellate counsel should have moved to suppress the confession note on the ground that the note was searched and seized without a warrant in order to gather evidence against Petitioner for Williams' death.  In essence, Petitioner is arguing that the officer's inventory search was an excuse to search Petitioner's person without a warrant.

To the extent the instant argument constitutes an independent claim that the police violated his Fourth Amendment rights in searching and seizing his confession note, the Court concludes that it fails to assert a proper basis for federal habeas relief under the doctrine established in *Stone v. Powell*,  428 U.S. 465, 494 (1976).  In *Stone*, the Supreme Court held that federal courts cannot provide habeas review of Fourth Amendment claims if the petitioner had a full and fair opportunity to litigate Fourth Amendment claims in the state courts.  *Id.*; *see Wright v. West*, 505 U.S. 277, 293 (1992) ("We have also held . . . that claims under *Mapp* [alleging evidence obtained in violation of the Fourth Amendment] are not cognizable on habeas as long as the courts have provided a full and fair opportunity to litigate them at trial or on direct review.").  A petitioner has had a full and fair opportunity to litigate such claims if the state has an available mechanism for suppressing evidence seized in or tainted by an illegal search or seizure, irrespective of whether the petitioner actually availed himself of that mechanism.  *See Boyd v. Mintz*, 631 F.2d 247, 250 (3d Cir. 1980); *U.S. ex rel. Hickey v.*

54

*Jeffes*, 571 F.2d 762, 766 (3d Cir. 1978); *Petillo v. New Jersey*, 562 F.2d 903, 906-07 (3d Cir. 1977). Conversely, a petitioner has not had a full and fair opportunity to litigate a Fourth Amendment claim, and therefore, avoids the *Stone* bar, if the state system contains a structural defect that prevented the state from fully and fairly hearing his Fourth Amendment claims. *See Marshall v. Hendricks*, 307 F.3d 36, 82 (3d Cir. 2002).

Here, Petitioner had a full and fair opportunity to litigate his Fourth Amendment claim. As just discussed, he filed a pre-trial motion to suppress the confession note. The Superior Court conducted a hearing, and denied the motion. Petitioner challenged the denial of the suppression motion on direct appeal, and the Delaware Supreme Court affirmed the Superior Court's decision. Even if Petitioner disagrees with trial counsel's choice of argument, Petitioner still had a "full and fair" opportunity to litigate his Fourth Amendment claim. *See, e.g., Marshall*, 307 F.3d at 82 (holding that "[a]n erroneous or summary resolution by a state court of a Fourth Amendment claim does not overcome the [*Stone*] bar."); *Gilmore v. Marks*, 799 F.2d 51, 57 (3d Cir. 1986).

Petitioner also cannot demonstrate that he was actually prejudiced by trial counsel's failure to base the suppression motion on the argument asserted here, or that he was prejudiced by appellate counsel's failure to raise this argument on appeal, because his instant argument is primarily a distinction without a difference. On direct appeal, trial counsel argued that "by unfolding the Confessional Letter and reading it the police exceeded the scope of the inventory search." *Taylor*, 822 A.2d at 1055. The Delaware Supreme Court found that, during a routine inventory search, it was not "unreasonable" for police to search any container or article in his possession, "in accordance with established inventory procedures." *Id.* By finding that the police did

not exceed the scope of the inventory search, the Delaware Supreme Court subsumed Petitioner's present argument.  In short, the motion to suppress failed because it lacked merit.  Thus, Petitioner cannot demonstrate that he was actually prejudiced by trial and appellate counsel's failure to present another version of a meritless argument.

The Court also concludes that the miscarriage of justice exception does not apply to excuse Petitioner's default of the instant Claim, because he has not provided new reliable evidence of his actual innocence. Therefore, the Court will deny Claim One (D) as procedurally barred.

### 4.  Claim One (E): Failure to Object to Biased Jury

#### a.  Death-qualification of The Jurors

Petitioner contends that trial counsel provided ineffective assistance by failing to object to the Superior Court's decision to strike a number of jurors for cause, based upon their opposition to the death penalty, thereby resulting in a jury that was "biased towards conviction." (D.I. 67 at 69-71)  Petitioner also presents an independent claim that the "death qualification process of [his] jury created a jury that was biased in favor of conviction and violated his right to a fair and impartial jury." (D.I 67 at 83)

In *Wainwright v. Witt*, 469 U.S. 412 (1985), the Supreme Court held that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment...is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Id*. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). The *Witt* Court explained that:

> this standard...does not require that a juror's bias be proved with "unmistakable clarity"...because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.

*Id.* at 424-26 (cleaned up).  Pursuant to *Witt*, a federal habeas court must defer "to the trial judge who sees and hears the jurors."  *Id.* at 428.  The Third Circuit has reiterated that the "trial court is in the best position to observe the demeanor of the prospective jurors."  *Deputy v. Taylor*, 19 F.3d 1485, 1499 (3d Cir. 1994).

Petitioner asserts that four jurors should not have been "*sua sponte*" excused by the Superior Court after indicating they were opposed to the death penalty.  (D.I. 67 at 69-72)  He also asserts that the Superior Court improperly excused five additional jurors for cause on the basis that they would not recommend or vote for imposition of the death penalty.  (D.I. 67 at 72)

The record rebuts Petitioner's underlying contention that qualified jurors were improperly excused based upon their death penalty views because, upon direct questioning, all nine jurors stated they would be unable to impose the death penalty.  Prospective juror PB said she was opposed to the death penalty but "guess[ed]" she "might be able" to recommend the death penalty.  Further questioning revealed that PB did not understand the balancing of aggravators and mitigators.  (D.I. 41-39 at 13-14)

57

After asking and receiving no objection from Petitioner and the State, the Superior Court excused PB.  Regardless of personal feelings, any juror's ability to follow the law is predicated upon a basic understanding of the law and the process.  Pursuant to *Witt*, Petitioner cannot demonstrate actual prejudice.

Prospective juror LK had many issues with being called as a juror – she had trouble sitting in confined spaces, her family needed her, she had heard about the case in the news, and she further stated that she did not "approve" of the death penalty.  (D.I. 41-38 at 47)  Thus, Petitioner cannot demonstrate prejudice resulting from LK's excusal, because the Superior Court had ample reasons to excuse the juror aside from her opposition to the death penalty.

Prospective juror RC stated he had trouble with the death penalty and would have "a lot of trouble living with [his] conscience if" he condemned someone to death. RC also stated that he could "find someone guilty or not guilty of a particular crime, but I don't think, in this day and age, we should be killing people."  (D.I. 41-37 at 2)  The Superior Court found that RC's clear opposition to the imposition of the death penalty precluded him from sitting on the jury.  Petitioner agreed that the juror was not qualified. (*Id.*)  Petitioner has failed to demonstrate actual prejudice.

Prospective juror BD unequivocally stated that he could "never" recommend the death penalty, regardless of the facts.  (D.I. 41-39 at 26-27) The Superior Court excused BD without objection as he did not qualify for a juror under the criteria set forth

in *Witherspoon v. Illinois*, 391 U.S. 510 (1968).[14]  Petitioner cannot demonstrate

prejudice resulting from BD being struck for cause.

    Petitioner contends that the Superior Court should not have struck for cause five

jurors who stated that they could perform the statutory duty of determining whether the

aggravating circumstances outweighed the mitigating circumstances, but regardless,

would not recommend death.[15]  Petitioner argues that "recommending death was not

part of the law."  (D.I. 67 at 72)  Petitioner is incorrect.  At the time of Petitioner's trial,

Delaware law required each potential juror to weigh the aggravators against the

mitigators and individually vote on his or her recommendation.  *See* 11 Del. Code §

4209(c)(3)b.  The Superior Court was required to consider the jury's final votes on the

aggravators and mitigators when deciding what sentence to impose.  Petitioner has

---

[14]In *Witherspoon*, the Supreme Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected." 391 U.S. at 522-23.  Consequently, veniremen can be excluded based on their views on capital punishment only if they would be biased and lack impartiality in hearing the case.

[15] Prospective juror JZ said that he opposed the death penalty, was not going to be able to recommend it, and that both his priest and son had told him that, as a good Catholic, he could not suggest the death penalty.  (D.I. 41-41 at 16-17)  The State challenged prospective juror AD for cause because he stated he was opposed to the death penalty and he could not put his personal feelings aside and follow the law as it required.  (D.I. 41-37 at 49)  The State moved to strike prospective juror MT for cause after she stated that she had "a real concern about sitting on a case where [she] knew the death penalty [was] an option," and that she just "ha[s] this thing about taking another human life." (D.I. 41-38 at 11)  Prospective juror JS stated that he did not believe in the death penalty and would vote "no" if asked.  (D.I. 41-38 at 17)  Prospective juror BF stated he had childcare issues, that anyone "charged" with murder should be locked away for life, and he was religiously opposed to the death penalty.  (D.I. 41-39 at 2-3)

failed to demonstrate how he was prejudiced by the Superior Court's accurate statement of the role and duties of each potential juror.

### b. Juror Taint

Petitioner contends that his right to an impartial jury was compromised because several prospective jurors told the Superior Court that they had discussed the case with other members of the jury pool. Petitioner argues that trial counsel provided ineffective assistance by failing to properly object to the discussion between the potential jurors and by failing to "ensure that members of the jury were adequately questioned." (D.I. 67 at 75-76)

In *Mu'Min v. Virginia*, 500 U.S. 415 (1991), the Supreme Court acknowledged that "our own cases have stressed the wide discretion granted to the trial court in conducting *voir dire* in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias." *Id*. at 427. If a trial court becomes aware of possible juror bias, it must investigate the source of the alleged bias, "determine its impact on the juror, and decide whether it was prejudicial." *Remmer v. United States*, 347 U.S. 227, 230 (1954); *see Anderson v. Phelps*, 930 F. Supp. 2d 552, 565 (D. Del. 2013). If the allegation of juror bias arises before the verdict, the trial court has "wide discretion" to determine the appropriate procedure to assess it. *See Reed v. Carroll*, 2005 WL 2086745, at *7 (D. Del. Aug. 26, 2005). It is well-settled that "*voir dire* provides a means of discovering actual or implied bias,"[16] and the juror's responses are not inherently suspect. *See Smith v. Phillips*, 455 U.S. 209, 217 n.7 (1982). If the jury bias claim "does not involve contact with a juror during a trial about a matter pending before the

---

[16]*J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 143 (1994).

jury ..., a new trial will only be warranted if the defendant proves that he was actually prejudiced by the improper contact." *Reed*, 2005 WL 2086745, at *6.  Thus, in such cases, the defendant "has the burden of proving actual juror bias." *Anderson*, 930 F. Supp. 2d at 565.

Petitioner's instant contention regarding the tainted jury pool is not supported by the record and, in fact, is pure speculation.  The discussions between potential jurors occurred during *voir dire* and none of the potential jurors identified by Petitioner were seated. The Superior Court cautioned the selected jurors in the "strongest terms" not to discuss the case with anyone.  (D.I. 41-39 at 43)  When the Superior Court realized a possible taint issue, it addressed the final panel of 16 jurors prior to the start of the trial as follows:

> SUPERIOR COURT: Now, the first question I want to ask you today is have you spoken with anyone about this case, including with other members of the jury since you were last in court?
>
> (Jurors shake their heads.)
>
> SUPERIOR COURT: Have you seen, read, or heard anything in the media about this case at any point?
>
> JURY: No.
>
> SUPERIOR COURT: And, finally, I discussed this, I think, with some of you during jury selection, but I want to be clear about this. Apparently during jury selection, at one or more times, one or two jurors who thought they had some personal knowledge concerning this case were so indiscreet as to say what was on their minds out loud. And I gather that at least a small number of other jurors in the panel heard some of what those jurors had to say.

> So I want to ask you specifically, while you were in the process of being selected, either when we were in Courtroom 301, the first big courtroom you were in, or during the questioning that each one of you went through in connection with the jury selection, did you hear any other jurors talking about this case?
>
> JURY: No.

(D.I. 41-47 at 11-12)

Based on the question the Superior Court posed and the collective answer of the jury, the trial record reflects that the empanelled jury was not tainted. Because Petitioner's claim of juror taint is unsupported by the record, he cannot show that trial counsel provided ineffective assistance by failing to ask the Superior Court to question the jury further. Accordingly, Petitioner has failed to demonstrate prejudice resulting from his default of these arguments.

The Court also concludes that the miscarriage of justice exception does not apply to excuse Petitioner's default of the instant Claim, because he has not provided new reliable evidence of his actual innocence. Therefore, the Court will deny Claim One (E) as procedurally barred.

### 5. Claim One (F): Prosecutorial misconduct

Petitioner asserts that trial and appellate counsel provided ineffective assistance by failing to argue that the State committed the following three instances of prosecutorial misconduct: (1) presenting the testimony of Tawana Ricks, Williams' sister who found Williams' children alone outside on the morning of the murder; (2) improperly appealing to the emotions of the jury in opening statements; and (3) disparaging trial counsel and vouching for the State in rebuttal closing argument. For

62

the reasons set forth below, the Court concludes that the State did not engage in prosecutorial misconduct. Relatedly, trial and appellate counsel did not provide ineffective assistance by failing to raise meritless objections.

In order for a prosecutorial misconduct claim to warrant federal habeas relief, the prosecutor's actions must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Darden v. Wainwright*, 477 U.S. 168, 180 (1986). A prosecutorial misconduct claim must be examined in "light of the record as a whole" in order to determine whether the conduct "had a substantial and injurious effect or influence" on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). When evaluating the impact of a prosecutor's misconduct, if any, a court must consider: (1) the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner; (2) whether it was isolated or extensive: and (3) whether the claimed misconduct was deliberate or accidental. *See United States v. Young*, 470 U.S. 1, 11-12 (1985). A court must also consider: (1) the strength of the overall proof establishing guilt; (2) whether defense counsel objected to the alleged misconduct; and (3) whether the trial court gave a curative instruction. *See id.* at 12-13; *Darden*, 477 U.S. at 181-82.

### a. Testimony of Williams' sister, Tawana Ricks

Petitioner asserts that the State only called Ricks to testify in order garner the jury's sympathy. This contention is unsupported by the record.

Prior to Ricks' testimony, the Superior Court held a sidebar for a "quick proffer." (D.I. 41-47 at 59) The judge expressed his concern about Ricks' emotional state and stated that, if Ricks was going to get emotional, the prosecution should quickly elicit the

needed testimony to limit the injection of any unnecessary emotion into the trial.  (*Id.* at 60-61)  The State advised the judge that the important fact it wanted to elicit was that Petitioner and Williams were involved in a romantic relationship. (*Id.* at 60-61)  Once on the stand, Ricks testified that her sister had been in a relationship with Petitioner.  After asking four questions, the State asked Ricks to identify Petitioner.  (*Id.* at 61)  Ricks became upset and said that she could not look at Petitioner. (*Id.* at 61)  The prosecution immediately stated, "Your Honor, I have nothing further for this witness."  (*Id.* at 62)  The judge asked trial counsel if they had any questions.  While trial counsel were conferring, Ricks *sua sponte* decided to answer the prosecution's question and identified Petitioner.  (D.I. 41-47 at 62)  Trial counsel did not cross-examine Ricks, and did not object either prior or during the direct examination.  Immediately after Ricks testified, the Superior Court provided the following curative instruction:

> Ladies and gentlemen of the jury, as you can understand, there is an emotional aspect to any case where someone has died.  And family members, in particular, human nature being what it is, are going to feel the loss particularly strongly.  As jurors, you have to view the evidence like objective people who do not have a personal interest in the case, and so you must take any feelings of emotion that are exhibited in the courtroom and put them aside for purposes of your deliberations.

(D.I. 41-47 at 62-63)

Viewing this record within the applicable legal framework demonstrates that the State did not commit misconduct.  Ricks provided relevant testimony and the prosecutor strictly limited the witness's testimony to reduce the jury's exposure to additional potentially emotional testimony.  Rick's emotional testimony was an isolated

64

occurrence, and was clearly not deliberate on the part of the prosecution.  In fact, once the prosecutor conducting Ricks' direct examination saw that she was becoming too emotional, he ended his questioning.  The State's case was strong given the physical evidence and, more importantly, Petitioner's confession.  Additionally, trial counsel did not object to Ricks' testimony and the trial judge gave an immediate curative instruction.  Given these circumstances, Petitioner cannot demonstrate that Ricks' testimony resulted in an unfair trial.

### b. Opening statements

Petitioner contends that the State's "narrative of Ms. Williams' morning was calculated to prey on the jury's emotions and inflame their passions by bringing to life in the courtroom the deceased and those she left behind."  (D.I. 67 at 79)  He further alleges that the statements "effectively placed each juror in the shoes of the victim." (*Id.*)  Petitioner is incorrect.

A prosecutor does not commit misconduct during opening statement by referring to evidence the prosecutor intends to introduce and which, in good faith, he or she believes is admissible.  *See, e.g., Lawrie v. Snyder*, 9 F. Supp. 2d 428, 442-43 (D. Del. 1998); *United States v. Bugg*, 483 F. App'x 166, 171 (6th Cir. 2012); *United States v. Chirinos*, 112 F.3d 1089, 1098 (11th Cir. 1997).  Evidence regarding what the victim was doing just prior to the murder and how the family members came to discover her body was relevant and admissible at trial.  The prosecutor may offer a complete picture of the facts surrounding a crime in order to show context and motive.  Here, the opening statement was not emotional and did not include inflammatory language.  Trial counsel did not object and the Superior Court did not react.  When viewed in light of the whole

65

record as a whole, the prosecutor's statements did not render Petitioner's trial fundamentally unfair.

### c. Rebuttal closing argument

Petitioner argues that the prosecutor, during closing rebuttal argument, disparaged trial counsel and improperly vouched for the State.  Specifically, Petitioner contends that the prosecutor "likened the defense to salesmen."  (D.I. 67 at 80)  What Petitioner fails to mention is that, in his opening statement, trial counsel likened the prosecutor's opening statement to a sales pitch:

> Classically, in law school we are told that it's an opportunity for the lawyers to tell the jury what they expect the evidence to be.  And, indeed, the prosecution has done that. It is an expectation, just like a sales pitch.  However, what you will be judging is not the sales pitch but the product.  And the defense asks you as you [sic] judge that product, use your common sense and use your everyday experiences. Analyze, test, evaluate that product. Because at the end of the case you're going to have to determine whether or not that product is something that you can rely upon, whether or not that product meets that very heavy burden placed upon the State in this case.

(D.I. 41-47 at 28).

The defense counsel again argued in closing argument:

> The State in its opening statement got up, and I believe the analogy that [the prosecutor] used when he was talking to you was basically advertising a product and, at the end of the day, the end of today literally, it's up to you to take that product and test it and utilize it and decide if it's all that it was sold to you as, if it's all that it's cracked up to be.

(D.I. 41-49 at 6)

The excerpts from the trial transcript speak for themselves. It was trial counsel, not the prosecutor, who made the first "salesmen" reference.  The prosecutor's

66

statement during rebuttal argument was an attempt to clarify that the State was not trying to "sell" a product but, rather, presenting evidence for the jury to consider.  There simply was no prosecutorial misconduct.

Petitioner also asserts that the prosecutor in rebuttal closing argument improperly vouched for the State by informing the jury what they already knew – that he was a prosecutor, not a salesman.

> But I am an attorney. I'm a prosecutor for the State of Delaware.  I am charged with the duty of submitting facts to you for you to evaluate. And that's what we've done in this case. We have the chance to get up here and argue to you all reasonable inference from the facts that have been presented. We have presented those facts. Those facts are before you in this case. To suggest that this murder may have been an accident is outrageous, we submit to you.  We've got an autopsy report, cause of death, strangulation.  Manner of death: Homicide – not accident, homicide.

(D.I. 41-49 at 31)

Again, the excerpt speaks for itself.  The prosecutor did not improperly vouch for the State by referencing the truth or asserting he had special knowledge. The prosecutor's argument was proper.

Having determined that the State did not engage in prosecutorial misconduct in the manner alleged by Petitioner, his related ineffective assistance of trial and appellate counsel claims necessarily fail.  Therefore, he cannot demonstrate that he will suffer actual prejudice as a result of the default of these arguments.

The Court also concludes that the miscarriage of justice exception does not apply to excuse Petitioner's default of the instant Claim, because he has not provided new reliable evidence of his actual innocence. Therefore, the Court will deny Claim One (F)

as procedurally barred.

### 6. Claim Two: Ineffective Assistance of Appellate and Post-Conviction Counsel

In Claim Two,[17] Petitioner asserts that appellate counsel provided ineffective assistance by failing to raise the following Claims on direct appeal: (1) the evidence of Williams' pregnancy was improperly admitted as evidence (related to Claim One (C)); (2) the confession note was improperly admitted at trial (related to Claim One (D)); (3) Petitioner was denied a fair and impartial jury (related to Claim One (E)); and  (4) the State engaged in prosecutorial misconduct (related to Claim One (F)).  (D.I. 67 at 85-86) Petitioner also asserts that, to "the extent initial post-conviction counsel failed to argue appellate counsel's ineffectiveness, they too were ineffective."  (D.I. 67 at 86)

Petitioner presented his ineffective assistance of appellate counsel argument to the Delaware state courts in his second Rule 61 motion.  As previously discussed, his second Rule 61 motion was denied as procedurally barred.  To the extent he blames first post-conviction counsel for not presenting the issue of appellate counsel's ineffective assistance in his first Rule 61 motion in an attempt to establish cause, it is unavailing.  The narrow exception articulated in *Martinez* applies only to allegations concerning trial counsel's ineffectiveness, not claims alleging the ineffectiveness of appellate counsel.  *See Davila*, 137 S.Ct. 2058, 2065 (2017) (declining "to extend *Martinez* to allow a federal court to hear a substantial, but procedurally defaulted, claim of ineffective assistance of appellate counsel").

In the absence of cause, the Court need not address the issue of prejudice.  The

---

[17]The Petition identifies this Claim as Claim Four. (D.I. 67 at 85)

Court also concludes that the miscarriage of justice exception does not apply to excuse Petitioner's default of the instant Claim, because he has not provided new reliable evidence of his actual innocence. Therefore, the Court will deny Claim Two as procedurally barred.

### 7. Claim Three: Cumulative Error

Next, Petitioner contends that the cumulative effect of each alleged error is sufficiently prejudicial to require relief. (D.I. 67 at 86-88) He argues that, even if none of his individual errors merit relief, the cumulative impact of the errors deprived him of a fair trial.

It appears that the United States Supreme Court has not recognized the concept of cumulative error. *See Bush v. Carpenter*, 926 F.3d 644, 686 n.16 (10th Cir. 2019). Since there is no clearly established federal law with respect to a cumulative error argument, arguably the Court's § 2254(d) analysis is over and Petitioner is not entitled to habeas relief for Claim Three.

Nevertheless, the Third Circuit has recognized the cumulative error doctrine on habeas review, holding that "a cumulative error argument constitutes a stand-alone constitutional claim subject to exhaustion and procedural default." *Collins v. Sec'y of Pa. Dep't of Corr.*, 742 F.3d 528, 542 (3d Cir. 2014). Pursuant to the cumulative error doctrine,

> [i]ndividual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process. Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to

69

> relief based on cumulative errors unless he can establish
> actual prejudice.

*Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008).

Petitioner presented this argument to the Delaware state courts in his second Rule 61 motion, and they denied it as procedurally barred. To the extent Petitioner attempts to establish cause by alleging the ineffectiveness of first post-conviction counsel for not presenting the cumulative error argument in his first Rule 61 motion, it is unavailing. Again, the narrow exception articulated in *Martinez* applies only to allegations concerning trial counsel's ineffectiveness.

In the absence of cause, the Court will not address the issue of prejudice. Additionally, Petitioner has not demonstrated that the miscarriage of justice exception to the procedural default doctrine applies, because he has not provided new reliable evidence of his actual innocence. Accordingly, the Court will deny Claim Three as procedurally barred.

## <u>CERTIFICATE OF APPEALABILITY</u>

A district court issuing a final order denying a § 2254 petition must also decide whether to issue a certificate of appealability. *See* 3d Cir. L.A.R. 22.2 (2011); 28 U.S.C. § 2253(c)(2). A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Further, when a federal court denies a habeas petition on procedural grounds

70

without reaching the underlying constitutional claim, the petitioner must demonstrate that jurists of reason would find debatable: (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the court was correct in its procedural ruling. *See Slack*, 529 U.S. at 484. "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further." *Id.*

For the reasons stated above, the Court concludes that Claims One (A) and Four do not warrant habeas relief under § 2254(d), and the Court is convinced that reasonable jurists would not find these conclusions unreasonable. The Court also concludes that Claims One (B)-(F), Two, and Three are procedurally barred from habeas review, and is convinced that reasonable jurists would not find these conclusions unreasonable. Consequently, Petitioner has failed to make a substantial showing of the denial of a constitutional right, and the Court will not issue a certificate of appealability.

## CONCLUSION

For the reasons discussed, the Court concludes that the instant Petition must be denied. An appropriate Order will be entered.